# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE STRAIGHT PATH
COMMUNICATIONS INC.
CONSOLIDATED STOCKHOLDER
LITIGATION

)
) C.A. No. 2017-0486-SG
)
)

## <u>MEMORANDUM OPINION</u>

Date Submitted: May 3, 2023
Date Decided:  October 3, 2023

Ned Weinberger and Mark Richardson, LABATON SUCHAROW LLP, Wilmington, Delaware; OF COUNSEL: Jeroen van Kwawegen, Edward G. Timlin, and Eric J. Riedel, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, New York, New York, *Attorneys for Lead Plaintiff Ardell Howard*.

Rudolf Koch, Kevin M. Gallagher, Daniel E. Kaprow, and John M. O'Toole, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Thomas Uebler, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; OF COUNSEL: Jason Cyrulnik, Paul Fattaruso, and Matthew Henken, CYRULNIK FATTARUSO LLP, New York, New York, *Attorneys for Defendants IDT Corporation, Howard Jonas, and The Patrick Henry Trust*.

**GLASSCOCK, Vice Chancellor**

A recurring theme of our corporate law involves stockholders with voting control of an entity using that control to influence a transaction in which the controller's interests diverge from that of the minority stockholders. Our law has developed mechanisms whereby such controllers may insulate themselves from the conflicted transactions.[1] Even where they do not, controller-driven transactions are not prohibited, but the controller bears the burden to demonstrate that the transaction was entirely fair to the minority. Under our controlling caselaw,[2] this court must undertake a unified fairness review, considering both price and process, to determine whether a transaction featuring a conflicted controller was entirely fair. If not, the controller has breached a fiduciary duty, for which damages, if any, may be awarded.

This post-trial opinion finds that the controller here, Howard Jonas, drove an unfair transaction in breach of fiduciary duty, but that no damages flowed therefrom.

The litigation involves two Delaware public corporations, IDT Corporation ("IDT") and Straight Path Communications Inc. ("Straight Path" or "SPCI" or the "Company"). IDT was founded by Defendant Howard Jonas,[3] who continues to own a controlling interest in IDT. IDT was founded in 1990 and became the Jonas family

---

[1] *In re MFW S'holders Litig.*, 67 A.3d 496 (Del. Ch. 2013), *aff'd sub nom. Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

[2] *E.g., In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d 667 (Del. 2023).

[3] I refer to members of the Jonas family throughout by first names to avoid confusion. No familiarity or disrespect is intended.

1

business. It became a public corporation in 1996. As of 2013, Howard was the chairman of the IDT board of directors and had installed his son, Shmuel, as CEO.

If the controller scenario here was paradigmatic, the transaction at issue was unique. Briefly, among IDT's assets were choses in action relating to patent infringement. IDT was reluctant to monetize these through litigation because of concerns about potential counterclaims against it. Accordingly, in 2013, IDT spun off Straight Path as a vehicle to pursue intellectual property litigation. Because stock in Straight Path was distributed *pro rata* to IDT stockholders, Howard became the majority stockholder in Straight Path as well as IDT. In the spin-off, Straight Path received the intellectual property assets from IDT (the "IP Assets"). For various tax reasons, IDT also transferred a portfolio of broadcast spectrum licenses (the "Spectrum Licenses") to Straight Path in the same transaction. These were mostly moribund, but a few licenses were leased to third parties and did bring in some income. Howard did not become a director of Straight Path. However, he installed another son, Davidi, as Chairman and CEO of the new company. He also recruited three outside directors to the board: K. Christopher Todd, William Weld, and Fred Zeidman.

As part of the spin-off, IDT and Straight Path entered a separation and distribution agreement. At issue here are indemnification rights under that agreement. Much of this litigation concerned the extent of those rights; it is

2

sufficient here to note that in some circumstances IDT was bound to indemnify Straight Path for certain losses.

As described above, the Spectrum Licenses were not considered by the parties involved to be particularly valuable. Changes in Federal Communications Commission ("FCC") regulations and the growing need for cellular spectrum changed that. After a bidding war that ran from 2017 to 2018, Verizon ultimately bought Straight Path—absent the IP Assets, which were sold to Howard—for approximately $3.1 billion. This amounted to roughly $184 per share, a huge windfall for Straight Path stockholders.

Prior to the sale, Straight Path and its Spectrum Licenses had become the subject of an FCC investigation, as had IDT itself. A requirement for holding such licenses is that the holder demonstrate substantial service—that is, that the license holder must be able to broadcast over the spectrum. When IDT renewed the licenses with the FCC prior to the spin-off, IDT was required to demonstrate the viability of each license. To do so, IDT permitted a technician to go from location to location, temporarily installing broadcast equipment, establishing transmission, then removing it for use in the next temporary installation. IDT then submitted these tests as substantial service demonstrations to the FCC.

Post-spin-off, Straight Path continued to fail to establish or maintain broadcast capabilities at most of the locations. In the investigation, the FCC maintained that

this procedure was not in compliance with its regulations. Ultimately, Straight Path entered a settlement with the FCC, under which it paid an upfront fine of $15 million. It also forfeited 196 Spectrum Licenses and was required to either give up all remaining licenses, sell the remaining spectrum assets, or pay an additional fine of $85 million. If Straight Path chose to sell the spectrum assets, it would pay a 20%-of-sale-proceeds penalty to the FCC. Straight Path determined that its best course of action was to sell the company. Once the IP Assets were sold separately, a sale of Straight Path was effectively a sale of the Spectrum Licenses, the sole remaining assets of the company.

The independent directors of Straight Path believed that the company could seek indemnification from IDT for the penalties under the settlement with the FCC (the "Indemnification Claim"). Because they believed that the Indemnification Claim was unlikely to be valued by a purchaser, they explored ways to preserve the claim as a stockholder asset, post-sale, including by creating a trust to hold the claim on the stockholders' behalf. Howard, however, got wind of this plan. He used his position as controller to cause the independent directors to release the Indemnification Claim, for $10 million and a contingent right to profits from the IP Assets. If the company sale had closed at the high bid as of the date the parties agreed to the release of the Indemnification Claim, the aggregate fine paid by

4

Straight Path would have amounted to $175 million (*not* counting the Spectrum Licenses forfeited).

This suit was brought on behalf of the class of minority stockholders of Straight Path, alleging that IDT and Howard had unfairly diverted merger consideration to themselves by stripping the right of stockholders to receive, through indemnification, the value turned over to the FCC as penalties. After much convoluted litigation, the matter was tried in the fall and winter of 2022. This is my post-trial decision.

It is clear that Howard used his control to seize the corporate machinery, causing the release of the Indemnification Claim in an unfair process. Howard, I note, because of his interests in Straight Path, appears to have individual interests aligned with the minority stockholders—maximizing the value of the Indemnification Claim. Howard's family interests, however, are aligned with IDT. Complicated financial and familial issues occupied much of the litigation. In the end, however, I find that Howard settled the Indemnification Claim in a manifestly unfair manner, in breach of his duties as a fiduciary.

The remaining question is damages. The Indemnification Claim was, in many ways, a flawed asset. It was contractually questionable, as will be explained below. Its existence was also rightfully considered a potential impediment to getting the best price for Straight Path in the auction. Considering all the evidence at trial, I

5

conclude that the price paid for the release of the Indemnification Claim was higher than would have resulted, absent the controller's intervention. Accordingly, I award the class nominal damages from Howard. My reasoning follows a recitation of the facts, below.

## I. BACKGROUND[4]

*A. Factual Background*

1. The Parties and Relevant Non-Parties

Ardell Howard is the lead Plaintiff in this suit.[5] Ms. Howard acquired three shares of Straight Path Class B common stock in October 2016, which she beneficially owned at the time of the merger with Verizon.[6]

Defendant IDT is a publicly traded Delaware corporation with its principal place of business in Newark, New Jersey.[7] IDT is the prior parent of non-party Straight Path.

Defendant Howard Jonas is IDT's founder and chairman.[8]

---

[4] Facts drawn from the exhibits jointly submitted by the parties are referred to by the numbers provided on the parties' joint exhibit list (cited as "JX__" unless otherwise defined). Trial testimony is cited as "TT (Name) __:__." The parties' Joint Pretrial Order, Dkt. No. 665, is cited as "PTO ¶ __."

[5] PTO ¶ 79.

[6] *Id.*

[7] *Id.* ¶ 83.

[8] *Id.* ¶ 80.

Defendant The Patrick Henry Trust was a trust established on July 31, 2013, to hold shares of Class A and Class B Straight Path stock for its sole beneficiary, Howard Jonas.[9]

Straight Path was a public company spun off from IDT on July 31, 2013.[10] In the spin-off, it received all of IDT's outstanding stock in Straight Path Spectrum, Inc. (formerly known as IDT Spectrum) as well as SPIP (formerly known as ICTI).[11] Straight Path was acquired by Verizon in a merger that closed on February 28, 2018.[12]

Shmuel Jonas is Howard's son. He serves as IDT's CEO.[13]

Davidi Jonas is another of Howard's sons. He served as Straight Path's CEO and chairman of the board from the spin-off until the merger with Verizon.[14]

K. Christopher Todd was a director of Straight Path from the spin-off through the merger.[15] Todd is a former prosecutor in the Southern District of New York and a named partner at the law firm Kellogg Hansen Todd Figel & Frederick.[16]

---

[9] *Id.* ¶¶ 81–82.
[10] *Id.* ¶ 91.
[11] *Id.* ¶¶ 91, 93.
[12] *Id.* ¶¶ 178, 180.
[13] *Id.* ¶ 86.
[14] *Id.* ¶ 92.
[15] *Id.* ¶ 100.
[16] TT (Todd) 1339:9–1340:7.

William Weld was a director of Straight Path from the spin-off through the merger.[17] Weld is a former governor of Massachusetts and previously served as both a U.S. Attorney for the District of Massachusetts and the Head of the Criminal Division of the U.S. Department of Justice.[18]

Fred Zeidman was a director of Straight Path from the spin-off through the merger.[19] Zeidman is a businessman with a background in restructuring who has served as chairman and CEO of multiple companies.[20]

## 2. Founding of IDT/Jonas Family Control

Howard Jonas founded IDT in 1990.[21] The company started out distributing brochures to hotels, eventually expanding into telecommunications via the international phone business.[22] IDT went public in 1996.[23] Howard has served as the company's chairman since its founding and was its CEO through 2013, when he was replaced by his son, Shmuel.[24] Howard continues to serve as an officer of IDT.[25] As described below, IDT has grown into a large enterprise, but in many ways it continues to be run like a family business.

---

[17] PTO ¶ 101.
[18] TT (Weld) 1893:19–1894:6.
[19] PTO ¶ 102.
[20] TT (Zeidman) 1593:13–1595:21.
[21] PTO ¶ 80.
[22] TT (Howard) 970:15–972:9.
[23] *Id.* at 972:11–973:10.
[24] PTO ¶ 80; TT (Shmuel) 606:2–18; JX120.0060.
[25] JX237.0046.

Howard and his family play an outsized role in the management of IDT. In addition to Howard's and Shmuel's roles at the company, Howard's sister, Joyce Mason, is IDT's general counsel.[26] Collectively, the Jonas family held 25.52% of IDT's outstanding shares and 74.98% of its voting power.[27]

### a. Spectrum Licenses Background

IDT purchased the Spectrum Licenses for approximately $30 million during the 2001 bankruptcy of Winstar Communications.[28] The FCC requires that licenses in the 28 and 29 GHz frequency bands, including the Spectrum Licenses, be renewed every ten years.[29] The Spectrum Licenses came to rest with IDT Spectrum, where they were written down to zero on the company's balance sheet.[30]

In mid-2009, Michael Rapaport, then President and CEO of IDT Spectrum, an IDT subsidiary, recognized the Spectrum Licenses' potential value.[31] In 2010, with the renewal period fast approaching, Rapaport negotiated an agreement with the Jonases, who were initially skeptical of the future value of the Spectrum Licenses, under which Rapaport and IDT would share both the costs and potential profits of renewal.[32] In addition to licensing fees, renewal required the licensee to

---

[26] JX827.0020–21.
[27] JX739.0060 (demonstrating 69% of IDT's voting power was held by Howard alone).
[28] TT (Shmuel) 563:3–21; TT (Howard) 978:23–980:23.
[29] TT (McDowell) 3056:11–21; TT (Davidi) 29:11–16.
[30] JX84.0002.
[31] *Id.*
[32] *Id.*

demonstrate that it had constructed equipment capable of providing users with "substantial service."[33]

From 2010 to 2012, IDT Spectrum, led by Rapaport, carried out an ambitious scheme to provide service demonstrations on a shoestring budget.[34] Rapaport began by engaging FCC regulatory counsel, including his brother, Max.[35] He also hired a wireless engineer, Douglas Lockie, to carry out the service demonstrations.[36] Constructing a permanent installation at each location where the company needed to demonstrate substantial service would have cost millions.[37] Instead, Rapaport's strategy involved having Lockie obtain access to suitable rooftops, sometimes through bribes, where he would set up a homemade radio transmitter he built for $450.[38] Lockie would only stay long enough to demonstrate signal viability, typically an hour or less, before breaking down the transmitter and moving to the next site.[39]

IDT consistently represented to the FCC, in both the renewal applications and subsequent document submissions, that it had constructed equipment capable of

---

[33] TT (McDowell) 3056:11–3057:8; JX749.0008 (citing 47 C.F.R. § 30.104 (2018)); JX187.0006.
[34] TT (McDowell) 3058:5–22; TT (Davidi) 213:11–22, 254:10–13; JX215.0135–148; JX136.001; JX187.0013.
[35] TT (Lamancusa) 466:14–467:20; TT (Shmuel) 565:21–566:7; TT (Ash) 811:20–812:7, TT 853:1-9.
[36] TT (Davidi) 30:24–31:2.
[37] JX136.0001.
[38] *Id.*; JX187.0013.
[39] JX187.0013.

transmitting at appropriate locations.[40] For example, one such substantial service submission claims that "IDT Spectrum has recently *completed construction* of a point-to-multipoint hub facility[.]"[41] The hub "*deploys* 1 foot antennas mounted on an Az-El positioner" and is "*located at* 200 Harbor Drive, San Diego," where it "*provides* fixed wireless coverage" to more than a million individuals.[42] Notably, these representations contained no caveats for the present-tense language or explanations of the ephemeral nature of Lockie's "construction."

The applications, subsequently granted, that IDT submitted to transfer the licenses to Straight Path took similar liberties in claiming that transmitting equipment had been "[c]onstructed" for each license.[43] Howard, Joyce Mason, and Michael Rapaport signed each of these applications, certifying their veracity.[44]

### 3. The Spin-Off of Straight Path

In March 2013, Howard led IDT's board in a discussion of the spin-off of an IP portfolio held by IDT subsidiary Innovative Communications Technologies, Inc. ("ICTI").[45] The portfolio in question included patents widely used in internet and video communications, which could be used to launch potentially lucrative patent

---

[40] *See, e.g.,* JX749:0015–16.
[41] *Id.* (emphasis added).
[42] *Id.* (emphasis added).
[43] JX215.0037–74.
[44] JX215.0037, -0087, -0104.
[45] JX86.0006–07.

infringement litigation.[46] However, this type of infringement litigation brought with it significant risks that targets would respond by asserting their own counter infringement claims against ICTI or IDT.[47] A spin-off to IDT's stockholders would allow the new company to pursue the infringement claims while shielding IDT's assets from these countersuits.

The new company, Straight Path, would hold two primary assets: the IP Assets, communications-related intellectual property, and the Spectrum Licenses, wireless spectrum licenses regulated by the FCC.[48] The Spectrum Licenses, along with the limited business they generated,[49] were added to the nascent company for two main reasons: (i) due to a favorable piece of the tax code, adding the Spectrum Licenses made the spin-off tax free; and (ii) losses from the spectrum business could offset patent profits, again for tax purposes.[50]

In order to mitigate counter-assertion litigation risks associated with his dual control of IDT and Straight Path, Howard created The Patrick Henry Trust (the "Trust") to hold his stake in Straight Path.[51] As a blind trust, the trust agreement

---

[46] *Id.*

[47] *See* TT (Ash) 750:9–751:3; TT (Davidi) 11:3–18, 14:16–16:5 (discussing counterclaim risk if Howard maintained joint direct control of both Straight Path and IDT).

[48] PTO ¶ 95.

[49] TT (Davidi) 16:22–18:1, 21:14–23:6; TT (Shmuel) 559:22–560:21; TT (Ash) 748:11–24, 749:1–8; TT (Howard) 986:19–987:13.

[50] TT (Davidi) 16:22–18:1; TT (Shmuel) 559:22–560:21; TT (Ash) 748:11–24, 749:1–8; TT (Howard) 986:19–987:13.

[51] TT (Ash) 750:9–751:3; TT (Davidi) 11:3–18, 14:16–16:5; JX366.

delegated complete decision making authority to the trustee, including over how to exercise the rights associated with Howard's Straight Path shares.[52] The trust agreement also included a specific carveout from this delegation: Howard would retain discretion over decisions relating to any merger or sale of the company.[53]

Pursuant to a tax separation agreement, transition services agreement, and separation and distribution agreement (the "S&DA"),[54] Straight Path spun-off from IDT on July 31, 2013.[55] Every IDT stockholder received one share of Straight Path stock for every two shares of IDT that they owned.[56]

*B. Period 2: Post-Spin-Off*

Post-spin-off, Straight Path formed a board of directors composed of Davidi, K. Christopher Todd, William Weld, and Fred Zeidman.[57] In addition to his directorial role, Davidi also served as the company's CEO.[58]

1. FiberTower Alleges Misconduct

Shortly after the spin-off, a competing spectrum company, FiberTower Corporation, first raised the question of the sufficiency of the methods IDT Spectrum had employed in renewing the Spectrum Licenses.[59] FiberTower argued that it

---

[52] JX366.0002.
[53] *Id.* at -0006.
[54] *See* JX107 (the "S&DA").
[55] PTO ¶ 91.
[56] *Id.* ¶ 94.
[57] *Id.* ¶¶ 92, 100–02.
[58] *Id.* ¶ 92.
[59] *See* JX103.0011–15.

should not be required to meet its FCC-imposed buildout deadlines because the companies that *had* completed buildout, most notably IDT Spectrum, had done so through "save builds" that did not provide meaningful service.[60] As evidence, FiberTower submitted a photograph taken on May 29, 2013, showing that the site of a purported IDT installation in Washington, D.C., was in fact, empty.[61] In February 2014, the FCC denied FiberTower's request, stating that approval of IDT's substantial service demonstrations was a "final action."[62] However, the FCC left open the question of whether IDT's licenses were "subject to cancellation for permanent discontinuance of operation[.]"[63]

Straight Path followed FiberTower's allegations and, on the advice of counsel, began taking remedial steps before the FCC issued its February decision.[64] Thus, when the FCC sent IDT[65] a letter the following month inquiring about the status of Straight Path's operations in the Washington D.C. area,[66] IDT and Straight Path were able to respond promptly.[67] Their response, issued by Joyce Mason in her capacity as IDT Capital's secretary,[68] reported that the D.C. hub in question had "been

---

[60] *Id.*

[61] *Id.* at -0013–14.

[62] JX113.0007.

[63] *Id.*

[64] JX918; JX919.

[65] JX114. Because the licenses were still in the process of being transferred, the letter was sent to IDT Capital, Inc., rather than Straight Path. TT (Davidi) 34:4–35:5; TT (Weld) 1973:12–1974:11.

[66] JX114.

[67] TT (Weld) 1863:6–1864:20.

[68] Mason is IDT's general counsel, Howard's sister, and Davidi's aunt.

operational" between "March 28, 2011 and the present."[69] The FCC subsequently expressed that it was satisfied with the response.[70]

### 2. The Spectrum Licenses Appreciate, A Whistleblower Emerges

By 2015, it was becoming increasingly clear that the Spectrum Licenses had the potential to become a valuable component of a future 5G wireless network.[71] Fed by speculation around this upside, Straight Path's stock price more than doubled between August 31 and October 23, 2015.[72] On November 5, 2015, an anonymous short seller published a report (the "Sinclair Upton Report" or the "Report") alleging that IDT Spectrum had "likely committed over 150+ counts of fraud against the US government" because its transmission equipment was "never built on the sites as specified in the filings."[73] Per the Sinclair Upton Report, Straight Path stock, which had been trading at almost $50 per share in October,[74] had a fair value of just a dollar or two.[75] On the day the Report was published, Straight Path's stock price dropped by over 50%.[76]

---

[69] JX116.001.
[70] TT (Weld) 1873:12–1874:10.
[71] TT (Davidi) 39:15–41:4.
[72] JX916.0011–12.
[73] JX137.0001.
[74] JX916.0011–12.
[75] JX137.0001.
[76] JX916.0012.

### a. Fallout from the Report

At a Straight Path board meeting held the next day, Davidi noted that the Report referred exclusively to pre-spin-off violations and that Straight Path had relied on representations that all licensing requirements were met, which were supported by IDT records of expenses for equipment purchases, FCC counsel, and engineering services.[77] Indeed, prior to the Sinclair Upton Report, neither Davidi nor the rest of the Straight Path board was aware of the methods that IDT Spectrum had employed in renewing the Spectrum Licenses.[78] The board then resolved to have management retain counsel to investigate the Report's allegations,[79] eventually settling on Morgan Lewis & Bockius LLP ("Morgan Lewis").[80]

A week later, a Straight Path stockholder filed a federal securities fraud class action (the "*Zacharia* action") in response to the drop in stock price, citing inconsistencies between Straight Path's securities filings and the allegations of the Sinclair Upton Report.[81] On December 1, 2015, Straight Path filed an 8-K in which it publicly acknowledged the Report's allegations, admitted that much of the equipment from the substantial service demonstrations was "no longer present at the

---

[77] JX141.0001.

[78] TT (Weld) 1912:10–17; TT (Davidi) 218:10–21, 248:5–23, 316:23–317:18.

[79] JX141.0002.

[80] PTO ¶¶ 105, 124; TT (Davidi) 58:12–59:2.

[81] *See* JX150. Straight Path settled the *Zacharia* action in January 2017 for approximately $9.5 million. TT (Breau) 2369:6–14.

16

original locations[,]" but nonetheless stuck to its position that renewal requirements had been met.[82]

In January 2016, Straight Path retained Boies Schiller Flexner LLP ("Boies Schiller") as litigation counsel in the *Zacharia* matter.[83] On February 26, Davidi sent an email to his brother Shmuel (IDT's CEO), Menachem Ash (IDT's in-house counsel), and Jason Cyrulnik (outside counsel to both IDT and Straight Path, then at Boies Schiller).[84] In the email, Davidi asked to set up a call with Ash and Shmuel, noting that "[a]ccording to a clause in the [S&DA], IDT indemnifies [Straight Path] for activities prior to separation."[85] He went on to state that "[g]iven the posture of the claims against [Straight Path] to date[,] that clause may be implicated."[86] Though Ash agreed to a call,[87] none of the parties to the email could remember a call happening or explain why it did not.[88] There is no evidence that either Davidi or David Breau (Straight Path's general counsel, copied on the email) ever followed up on the email.[89]

---

[82] JX152.0002.
[83] PTO ¶ 112.
[84] JX161.
[85] *Id.*
[86] *Id.*
[87] JX163.0001.
[88] TT (Davidi) 275:10–276:15; TT (Ash) 918:10–919:7; TT (Schwell) 2861:20–2862:8; TT (Breau) 2418:6–14; TT (Shmuel) 698:7–11.
[89] *See* TT (Davidi) 278:22–279:8; TT (Breau) 2419:1–17.

### 3. Morgan Lewis Memo, Straight Path White Paper

On July 21, 2016, Morgan Lewis delivered a memo (the "Memo") summarizing the findings of its internal investigation into the allegations of the Sinclair Upton Report.[90] The Memo concluded that no transmission equipment was in place at any site visited, nor had such equipment ever been permanently installed.[91] However, the Memo further concluded that evidence of Doug Lockie's string of temporary installations contradicted claims in the Sinclair Upton Report that the demonstrations were merely a "paper exercise," with no construction ever actually occurring.[92] Finally, Morgan Lewis concluded that, prior to the Report, Straight Path itself was unaware of the lack of permanent equipment.[93] The next day, Straight Path filed another 8-K in which it updated stockholders on these broad conclusions.[94]

On August 1, Morgan Lewis partner Frank Lamancusa met with the FCC and provided the Commission with a redacted copy of the Memo.[95] The following day Lamancusa followed up by email seeking to set up a discussion of "the particulars of the [FCC's] desired legal analysis[.]"[96] This legal analysis eventually took the

---

[90] JX178.
[91] *Id.* at -0001.
[92] *Id.*
[93] *Id.*
[94] JX182.0003.
[95] JX185; JX187.0001, 05; PTO ¶128.
[96] JX186.0001–02.

form of a white paper authored by Straight Path's FCC counsel (the "White Paper") and submitted to the FCC on August 19, 2016.[97] The White Paper advanced an interlocking series of arguments against Straight Path's liability: first, that the FCC's 2011 and 2012 substantial service determinations were correct and are now final; second, that the FCC's Discontinuance Rule does not apply; third, that even if that rule applied, it has not been violated; and finally, even if there has been a violation, enforcement would undermine the public interest.[98] These arguments would form the basis for both Straight Path's settlement negotiations with the FCC, as well as some of the parties' contentions here.[99]

### 4. The FCC Investigation

On September 20, 2016, the FCC launched parallel inquiries into Straight Path and IDT's handling of the Spectrum Licenses.[100] The letter of inquiry sent to Straight Path cited potential violations of FCC rules governing candor, substantial service demonstrations, and permanent discontinuance of service.[101] IDT and Straight Path coordinated their response to the FCC inquiries through shared legal

---

[97] JX192.
[98] *See id.* at -0004–06.
[99] TT (Davidi) 95:18–97:10 (arguing it was in IDT's best interests to settle in order to avoid losing maximization of the Spectrum Licenses).
[100] JX198; JX199. The FCC closed its inquiry into IDT with a "no further action" letter in August 2022. JX906.
[101] JX199.0002–03.

counsel.[102]  On October 11, both companies sent the FCC their initial responses to their respective letters of inquiry.[103]  Similar to its position in the White Paper, Straight Path argued that it was not liable for violations that took place before it controlled the licenses in question.[104]  Straight Path's response also noted that "IDT is obligated to reimburse Straight Path for the payment of any liabilities arising or related to the period prior to the Spin-Off."[105]  In its response, IDT admitted that any construction or service demonstrations occurred under the auspices of IDT Spectrum.[106]  On October 14, IDT acknowledged in its annual 10-K that, "should the FCC impose liability on Straight Path, [IDT] could be the subject of a claim from Straight Path related to that liability."[107]

As early as June 2016, Straight Path had begun to receive unsolicited attention from third-parties interested in purchasing the Spectrum Licenses.[108]  However, it became clear that some of these offers were contingent on the resolution of, or were otherwise negatively impacted by, the FCC investigation.[109]  This encouraged Straight Path to take an active approach to resolving the FCC inquiry with the goal

---

[102] JX683.0064, 78; JX678.0002, 04 (IDT Privilege Log); JX680 (Straight Path Privilege Log) Entry Nos. 3586–87, 3828, 3831, 3929, 4224, 4292, 4772, 4799, 4858.
[103] JX214; JX216.
[104] JX214.0015–16.
[105] *Id.* at -0009.
[106] JX216.0010–11.
[107] JX237.0014.
[108] JX577.0065; TT (Davidi) 110:12–111:13; TT (Todd) 1208:22–1209:2.
[109] *See, e.g.,* JX248.0002 (discussing communications from an interested party, in which the FCC inquiry weighed heavily).

20

of getting "a clean bill of health" for its licenses.[110]  On October 28, the board retained Evercore Group LLC ("Evercore") as financial advisers to aid in "evaluation of unsolicited offers received by the Company."[111]  The company subsequently retained Weil, Gotshal & Manges LLP ("Weil") as legal advisers on the same matters.[112]

On November 2, Frank Lamancusa of Morgan Lewis reached out to the FCC expressing a desire to discuss "next steps" or a "mutually agreed upon solution."[113] Following a meeting between Straight Path counsel and the FCC on November 10,[114] Lamancusa reached back out to inquire when the Commission "would know a timeline for the investigation."[115]  The FCC responded on November 15 that, unless Straight Path had "a specific proposal" on how to proceed, the FCC would "need time to review the documents" Straight Path had produced before it could "respond on what the next steps would be and the associated timing for their completion."[116] The next day, Lamancusa replied that Straight Path would gladly meet "to discuss the scope and scale of a consent decree."[117]

---

[110] TT (Weld) 1716:16–1717:12, 1717:14–17; TT (Todd) 1212:5–1213:2; TT (Zeidman) 1512:21–1513:17; TT (Breau) 2370:17–2371:14.
[111] PTO ¶¶ 103, 138.
[112] *Id.* ¶¶ 104, 139.
[113] JX243.
[114] *See* JX249.0002 (referencing a meeting "last Thursday" in an email dated November 14, 2016).
[115] *Id.* at -0003.
[116] *Id.* at -0002.
[117] *Id.* at -0001.

On November 28, Lamancusa sent the FCC a document outlining the proposed terms of a consent decree,[118] sparking a round of rapid negotiations.[119] Following a meeting on Wednesday, November 30, Straight Path provided a revised proposed term sheet on December 2, ahead of a second meeting scheduled for Wednesday, December 5.[120] Roughly contemporaneous with these negotiations, Davidi met with Howard and informed his father that the FCC had proposed a settlement in which Straight Path would give up half of the proceeds it obtained from selling the Spectrum Licenses.[121] Howard told his son that "this is a first offer […] you should keep negotiating […] because you can do much better."[122]

Negotiations between Straight Path and the FCC continued throughout December 2016.[123] In the second half of the month, Howard began to take a more active role in the deal, with a particular focus on the impact the impending change in presidential administration might bring.[124] In a December 18 email discussing deal progress, one of Straight Path's advisors at Evercore noted that Straight Path's general counsel, David Breau, had informed him that "Howard Jonas and/or IDT

---

[118] JX256.
[119] TT (Davidi) 116:23–117:20.
[120] JX259.0001.
[121] TT (Howard) 990:6–14 (discussing a conversation that occurred six weeks before the consent decree of January 11, 2017).
[122] TT (Howard) 992:1–6.
[123] JX263; JX265; JX266; JX268; JX276; JX277; JX279; JX280; JX281; JX282.
[124] TT (Howard) 989:19–996:9.

would contribute a lot towards funding [any FCC penalty.]"[125] Just four days later, Breau and Straight Path's outside counsel participated in a call with Howard and Shmuel to discuss "the deal overall,"[126] including the impact of the changing administrations.[127]

In early January 2017, Howard and Davidi met to discuss the FCC's most recent offer.[128] Unlike their previous meeting the month before, Howard did not explicitly tell his son to renegotiate, instead indicating that he would reach out to his political contacts to assess what a deal might look like under the new administration.[129] On January 8, Howard flew to the Dominican Republic to meet with Straight Path director William Weld, whose tenure as governor of Massachusetts had left him with contacts in Washington, D.C..[130] The two discussed the pros and cons of waiting for the new administration versus settling with the current one.[131] Weld believed that settling with the present administration was the prudent choice.[132] The conversation also touched on the topic of indemnity, but it

---

[125] JX275.
[126] JX282; JX572.0199–205; JX836.0001.
[127] TT (Howard) 1117:13–1119:2.
[128] *Id.* at 992:12–23 (discussing a conversation that took place about a month after the previous one).
[129] *Id.* at 992:12–994:10.
[130] *Id.* at 996:23–997:17; TT (Weld) 1940:5–12.
[131] TT (Howard) 1000:2–1001:2; TT (Weld) 1940:5–9, 1941:12–22.
[132] TT (Howard) 1001:3–1004:3, 1122:17–22; TT (Weld) 1943:12–1945:14.

was not a focus.[133]  Ultimately, Howard took the position that it would be more favorable to wait for the new administration.[134]

On January 11, 2017, Straight Path officially entered a settlement with the FCC in the form of a consent decree (the "Consent Decree").[135]  In exchange for the resolution of potential violations of FCC rules governing candor, substantial service, and permanent discontinuance, Straight Path made an initial payment of $15 million and gave up 196 of its Spectrum Licenses for termination.[136]  The Consent Decree did not require Straight Path to admit to any violations.[137]  The FCC also agreed not to pursue further investigation of Straight Path "in the absence of new material evidence."[138]  Because Straight Path was given leeway to choose which licenses would be terminated, it strategically chose those with the least impact on the portfolio's ultimate sale value.[139]

The Consent Decree also required Straight Path to choose one of three additional penalties: (1) an additional penalty of $85 million, due within 12 months; (2) termination of the remaining Spectrum Licenses; or (3) forfeiture of 20% of the proceeds from a sale of the remaining Spectrum Licenses.[140]

---

[133] TT (Weld) 1947:13–24.
[134] TT (Davidi) 307:4–308:6.
[135] JX825; JX314.0002; JX322.0001.
[136] PTO ¶ 135.
[137] TT (Furchtgott-Roth) 347:20–24.
[138] JX322.0006.
[139] TT (Davidi) 129:3–131:13; TT (Zeidman) 1583:2–1585:6; TT (Weld) 1927:16–23.
[140] JX322.0001.

### 5. The Indemnification Claim and the Sale

The Consent Decree cleared the way for Straight Path to sell the Spectrum Licenses.[141] However, the independent directors worried that an acquirer would not be interested in pursuing the company's Indemnification Claim against Howard and IDT for pre-spin-off activities giving rise to the FCC investigation the Indemnification Claim.[142] Because the independent directors believed the Indemnification Claim was valuable to Straight Path stockholders, they began to explore opportunities to preserve the claim as Straight Path worked towards an acquisition.[143]

#### a. Bidding Begins, The Special Committee is Formed

On January 31, 2017, the Straight Path board met with Evercore and Weil by telephone.[144] The board authorized Evercore to work with management to identify potential bidders and begin outreach.[145] Early the next month, Evercore contacted 20 potential bidders, 11 of which eventually executed confidentiality agreements with Straight Path.[146]

On February 6, the board formed a special committee (the "Special Committee") consisting of the three independent directors: Todd, Weld, and

---

[141] TT (Davidi) 131:22–132:13.
[142] TT (Weld) 1952:17–1953:9; TT (Fortinsky) 2238:18–2239:8.
[143] TT (Weld) 1767:8–10; TT (Todd) 1377:9–17; TT (Fortinsky) 2238:2–13.
[144] PTO ¶ 140.
[145] *Id.*
[146] *Id.* ¶ 141.

Zeidman.[147]   The initial purpose of the Special Committee was to explore the possibility of monetizing Straight Path's IP Assets, which the board believed should be sold separately in order to maximize stockholder value.[148]   The Special Committee was necessary because IDT was a potential buyer for the IP Assets, creating a conflict for Davidi.[149]

Though it was not initially in the explicit scope of the Special Committee's responsibilities,[150] evaluation of Straight Path's options regarding the Indemnification Claim quickly became the independent directors' main focus.[151] The independent directors had begun interviewing potential legal advisors as early as December 2016,[152] eventually settling on Shearman & Sterling LLP ("Shearman").[153]   Shearman understood from the outset that its role involved advising on the Indemnification Claim.[154]

The Special Committee met for the first time on February 14, 2017.[155]  At that meeting, Shearman attorneys discussed preservation of the Indemnification Claim with the Special Committee.[156] The Special Committee then unanimously expressed

---

[147] *Id.* ¶ 152.
[148] JX358.0002; TT (Weld) 1726:14–1727:1.
[149] JX349.0001; TT (Davidi) 143:22–144:21.
[150] *See* JX349.
[151] TT (Fortinsky) 2224:7–14, 2228:18–23; TT (Weld) 1939:9–22.
[152] TT (Fortinsky) 2219:16–2220:7.
[153] PTO ¶ 109.
[154] TT (Fortinsky) 2056:11–13.
[155] PTO ¶ 153.
[156] JX357.0001.

interest in preserving and pursuing the Indemnification Claim.[157] This decision was motivated by the Special Committee's desire to ensure that Straight Path stockholders receive fair value for the Indemnification Claim, which might be undervalued by an acquirer.[158] On February 24, the Special Committee formalized its relationship with Shearman in an engagement letter.[159] On February 28, Shearman informed Weil that the Special Committee intended to preserve the Indemnification Claim, potentially by assigning the claim to a litigation trust.[160]

The S&DA contains a provision precluding the assignment of rights or delegation of duties under that agreement without the prior written consent of the other party.[161] Apparently, the Special Committee did not contemplate that IDT would give its consent; accordingly, in March the Special Committee asked its advisors at Shearman and Morris, Nichols, Arsht & Tunnell LLP ("MNAT") to develop potential litigation trust structures that could preserve the Indemnification Claim *without* assignment.[162]

---

[157] *Id.*
[158] TT (Weld) 1949:23–1950:2; TT (Fortinsky) 2238:14–17.
[159] PTO ¶ 154.
[160] JX577.0068.
[161] JX107.0030.
[162] TT (Weld) 1978:18–1979:7; *see* PTO ¶ 108.

### b. The Special Committee Decides to Preserve the Indemnification Claim

On March 2, Evercore received preliminary bids ranging from $435 million to $602 million from AT&T, Verizon, Sprint, and T-Mobile.[163] The following week on March 8, the Special Committee held a meeting attended by Breau as well as attorneys from Shearman and Weil.[164] Representatives from Weil expressed that both they and Evercore were concerned about the risk that separating the Indemnification Claim would negatively impact the sale process.[165] The Special Committee unanimously agreed that settlement of the Indemnification Claim would benefit the Straight Path stockholders, but that it was worth considering additional options.[166] One option discussed was the creation of a trust to preserve the Indemnification Claim.[167] In the interests of exploring a settlement, Weld agreed to reach out to Howard for a discussion.[168]

Following this meeting, Breau, Straight Path's general counsel, informed Shmuel, IDT's CEO, about the Special Committee's plan to preserve or pursue the Indemnification Claim.[169] Shmuel passed this information on to Howard.[170] Shortly

---

[163] PTO ¶ 143.
[164] JX390.0001; JX389.0001.
[165] TT (Fortinsky) 2085:24–2087:3, 2089:13–2090:10.
[166] *Id.*; TT (Weld) 1960:14–1962:4; TT (Fortinsky) 2244:6–17.
[167] JX390.0001.
[168] JX389.0002.
[169] TT (Shmuel) 595:4–596:1, 690:2–18.
[170] *Id.* at 690:19–21.

thereafter,[171] Howard received the call from Weld to discuss the potential settlement of the Indemnification Claim.[172] Howard asked that the Special Committee put their rationale for pursuing the claim into writing and he would raise it with Shmuel, who was skeptical of the claim's value.[173]

On March 10, the Special Committee resolved that an upcoming process letter being sent to bidders would disclose that the Indemnification Claim would be excluded from the transaction.[174] Three days later, Evercore reported to Straight Path that Verizon had expressed a willingness to preempt the auction process on an accelerated basis, unilaterally raising its bid to $750 million.[175] That day, the Special Committee met again and heard a presentation from Weil advocating against including a statement about the Indemnification Claim in the process letter.[176] Nonetheless, at the end of the meeting the Special Committee remained in favor of including the statement.[177]

---

[171] *See* TT (Howard) 1016:6–24 (testifying that he first heard about the Indemnification Claim from Shmuel).
[172] *Id.* at 1018:11–1020:5.
[173] *Id.*
[174] JX392.0001.
[175] PTO ¶ 144.
[176] JX405.0001; JX720.0141:15–142:20; TT (Weld) 1754:6–13, 1890:13–1891:6.
[177] JX405.0001.

### c. Howard Reacts

Howard was quickly informed of the Special Committee's intentions,[178] which upset him.[179] Breau tried to set up a discussion between Howard and the Special Committee members[180] but had been informed by Shearman that it was inappropriate for the independent directors to speak to Howard without counsel.[181] This angered Howard further and, over the next two days, he made multiple unsuccessful attempts to contact each of Special Committee members.[182] On March 14, Straight Path's full board instructed Evercore to send out the process letter for the second-round bid,[183] including a statement expressing the company's intent to exclude the Indemnification Claim from the sale.[184]

From the evening of March 14 through the morning of March 15, Howard called Weld around a dozen times.[185] Though Weld initially resisted, he eventually answered because he knew Howard was distraught.[186] During that call, Howard expressed anger with the Special Committee's decision to pursue the Indemnification Claim, potentially impacting the auction process, which he thought

---

[178] TT (Howard) 1023:18–1024:7.
[179] *Id.* at 1141:23–1142:18.
[180] TT (Fortinsky) 2256:22–2257:16.
[181] *Id.* at 2264:20–2265:10.
[182] TT (Howard) 1026:4–1027:17.
[183] JX588.0061.
[184] JX410.0004; TT (Weld) 1963:18–1964:22; PTO ¶¶ 145, 161–62.
[185] TT (Weld) 1965:11–1966:12.
[186] *Id.* at 1966:2–1967:3.

was in Straight Path's best interests.[187]  When Howard's efforts to pressure Weld to drop the Indemnification Claim proved unsuccessful, Howard raised the possibility that he was "going to put it all on Mintz [Levin,]"[188] the law firm where Weld was a partner and which had served as FCC counsel to both IDT and Straight Path.[189]  Weld took this as a serious threat that Howard wanted the Indemnification Claim settled, "or else."[190]

Following Howard's call with Weld, Shearman instructed the Special Committee members not to communicate directly with Howard.[191]  Accordingly, Howard's subsequent attempts to reach Zeidman and Todd were unsuccessful.[192]  Howard thought that it was "insane" for Shearman "not to let the controlling shareholder speak to his own directors" "in the middle of what could be a billion dollar deal[.]"[193]

On March 15, Jason Cyrulnik of Boies Schiller contacted Breau seeking a conflict waiver that would allow his firm to represent IDT with regard to the Indemnification Claim, despite its substantial previous representation of Straight Path.[194]  Breau provided a waiver on March 17, requesting that Boies Schiller engage

---

[187] *Id.* at 1967:7–18, 2053:16–18.
[188] *Id.* at 1967:19–1968:1; TT (Howard) 1144:9–1145:23.
[189] TT (Weld) 1838:20–23; PTO ¶ 106.
[190] TT (Weld) 1968:7–1969:4, 1968:18–24, 1969:1–4.
[191] *Id.* at 1958:8–21.
[192] TT (Howard) 1030:4–1031:7.
[193] *Id.* at 1146:10–23.
[194] PTO ¶ 163.

directly with the Special Committee's attorneys at Shearman.[195] On March 19 or 20, Cyrulnik had a call with Fortinsky of Shearman in which he communicated that Howard was not prepared to support a transaction that preserved the Indemnification Claim.[196] The Special Committee understood this to mean that Howard's support for a the sale of Straight Path would be conditional on the resolution of the Indemnity Claim.[197] Due to Howard's voting control of Straight Path, his support was necessary to a sale of the company.[198]

On March 19, Shearman reached out to Weil and Breau to propose a March 23 meeting between Howard and the Special Committee.[199] That meeting was eventually scheduled for March 29.[200] Though Shearman had floated the idea of a neutral mediator to Howard, suggesting former Chancellor Chandler or former Vice Chancellor Lamb as options,[201] Cyrulnik rejected the proposal on behalf of Howard and IDT.[202]

On March 28, the Special Committee met to discuss the upcoming meeting.[203] The independent directors noted that the litigation trust term sheet and description

---

[195] *Id.* ¶ 164.
[196] JX588.0062; TT (Fortinsky) 2245:21–2246:6; *see* TT (Fortinsky) 2272:5–15 (discussing which day the call occurred on).
[197] TT (Fortinsky) 2274:9–16, 2346:6–14.
[198] *Id.* at 2273:16–2274:8.
[199] JX421.0001–02.
[200] PTO ¶ 167.
[201] TT (Fortinsky) 2279:16–2280:21, 2283:4–2284:12.
[202] JX449.0002.
[203] JX453.0001.

of the Indemnification Claim had not been circulated to the bidders, which the Special Committee had requested, resolving that these documents should be added to the deal's data room no later than March 31.[204]

The auction process continued as negotiations around the Indemnification Claim ramped up. Following the March 14 process letter, which contained a statement that the Indemnification Claim would be excluded from any contemplated transaction, bidders had questions about the nature of the Indemnification Claim.[205] AT&T expressed a preference for the claim to be resolved prior to closing.[206] However, no bidder ever withdrew, lowered its bid, or expressed concern about the Indemnification Claim's impact on the validity of the Spectrum Licenses.[207] Indeed, from March 21 to 23, the four largest bidders all raised their bids, each indicating a willingness to pay $750 million or more.[208]

### d. The Lead-Up to the March 29 Meeting

Going into the March 29 meeting, the Special Committee faced a number of competing considerations. Though they were convinced of the Indemnification

---

[204] *Id.*

[205] TT (Evercore) 3010:16–3013:18; TT (Breau) 2376:21–2377:4; JX688; TT (Verizon Designations) 94:17–95:18 ("We wanted to understand what it was.").

[206] JX454.0006.

[207] TT (Davidi) 312:7–11; TT (Evercore) 3013:23–3015:6; TT (Fortinsky) 2253:1–2254:15; JX720.0166 (Weil Designations) 166:3–25; TT (Breau) 2470:15–2471:13; *see also* JX688.0177 (Verizon Designations) 177:08–14; TT (Evercore) 3015:2–9; JX720.0166 (Weil Designations) 166:7–12; TT (Breau) 2473:5–2474:9; *see also* JX688.0173 (Verizon Designations) 173:10–22.

[208] PTO ¶¶ 146–49; TT (Evercore) 3015:16–3017:20.

Claim's value,[209] the Special Committee members were aware that resolution of the claim may well lead to a smoother process in the ongoing sale of the company.[210]  In addition, Howard had injected a further element of time pressure by threatening to withhold his support for *any* sale unless the Indemnification Claim was resolved by the end of March.[211]  Accordingly, the Special Committee felt that the weight of these asymmetrical negotiating positions put pressure on them to resolve the claim at the March 29 meeting.[212]

Howard had also been preparing for the meeting.  Following lobbying from Davidi, in which he "begged" his brother to settle the claim,[213] Shmuel and Howard resolved that IDT would settle the Indemnification Claim for $10 million and "not a penny more[.]"[214]  Howard would make this up to Shmuel by purchasing an equivalent sum in IDT stock,[215] in light of Shmuel's emphatic position that Straight Path was owed nothing.[216]  Howard communicated this $10 million cap to Weld ahead of the meeting.[217]

---

[209] TT (Howard) 2238:21–2239:8, 2240:2–10.
[210] TT (Zeidman) 1564:1–5; TT (Todd) 1412:6–14; TT (Weld) 1804:6–13.
[211] TT (Fortinsky) 2276:6–2277:11.
[212] TT (Weld) 1993:10–1994:4; *see also* TT (Weld) 1994:17–1995:11; TT (Todd) 1388:6–21; TT (Fortinsky) 2242:3–18.
[213] TT (Davidi) 153:11–154:16; TT (Shmuel) 597:11–598:23.
[214] TT (Shmuel) 725:16–726:1; TT (Howard) 1085:1–20.
[215] TT (Shmuel) 598:24–602:11, 725:7–726:1; TT (Howard) 1157:12–1158:18.
[216] At trial, Shmuel compared the Special Committee's position to ingrates disparaging the gift of a "golden chicken."  TT (Shmuel) 581:21–583:7.
[217] TT (Weld) 1985:21–1987:14.

Howard took additional steps to ensure that he could exercise his control of Straight Path with regard to both a settlement and sale.[218] Acting on Howard's behalf, Cyrulnik obtained a dissolution agreement of The Patrick Henry Trust on March 28.[219] This agreement, already signed by the trustor, would enable Howard, upon signing, to immediately regain control of his voting control of Straight Path.[220]

### e. The Meeting

On March 29, 2017, Howard, IDT representatives, the Special Committee, and their respective counsel met at Weil's offices in New York.[221] Shmuel kicked off the initial large group session with a declaration that "'I have a figure for how much I'd be willing to pay for the indemnification claim, and that's *zero*.'"[222] Howard followed on, angrily describing the Special Committee as "bullshit directors" who had failed at their job to "look out for Davidi."[223] Cyrulnik then took to the floor to argue that the Indemnification Claim was not valuable for a variety of

---

[218] *See* TT (Howard) 1158:19–1159:16.
[219] JX451.0001; TT (Howard) 1158:19–1159:16.
[220] JX451.0004.
[221] PTO ¶ 167.
[222] TT (Weld) 1990:6–1991:13, 1799:20–1800:3 (emphasis added).
[223] TT (Fortinsky) 2302:4–7; *see also* TT (Todd) 1313:1–13, 1392:14–1393:23; TT (Zeidman) 1649:23–1650:8.

reasons.[224]  Shearman responded with a presentation that valued the Indemnification Claim in the range of $60 million.[225]

The discussion then moved to a breakout session consisting of Howard, Cyrulnik, Weld, Todd, Zeidman (by telephone), and Creighton Condon of Shearman.[226]  In the hallway between the two sessions, Howard flashed The Patrick Henry Trust's dissolution agreement to Weld, saying "Bill, look at this … [i]t's already been dissolved."[227]  When Weld described the exchange to the other independent directors, prior to entering the small group meeting,[228] they realized that the dissolution of the Trust meant that Howard had the power to remove them as directors.[229]

This realization added to the intense pressure on the Special Committee to come to an agreement.[230]  Seeking to secure *something* for the Straight Path stockholders,[231] the Special Committee capitulated to Howard's $10 million figure

---

[224] *See, e.g.,* TT (Todd) 1266:7–1267:23; TT (Fortinsky) 2304:6–2305:2 (describing the arguments raised).

[225] While only Howard recalls a specific number, recollections generally agree upon this range. *See* TT (Fortinsky) 2149:7–14 (recalling a figure in the range of $50–70 million); TT (Ash) 831:8–832:7 (recalling $60 or $70 million); TT (Howard) 1078:16–22 (recalling $60 million); TT (Todd) 1307:11–1308:7, 1403:5–12 (recalling a number "probably considerably below" $100 million).

[226] PTO ¶ 168.

[227] TT (Weld) 2000:15–2001:1.

[228] *Id.* at 2002:3–5.

[229] *Id.* at 2001:2–18.

[230] *Id.* at 2007:6–9 (describing how the Special Committee felt it had no "realistic choice other than to take the deal Howard presented"); TT (Todd) 1313:14–1314:3.

[231] *See* TT (Weld) 1835:16–1836:2, 2004:7–15; *see also* TT (Todd) 1312:2–24, 1313:1–13, 1387:23–1389:5, 1389:18–1390:12.

during the breakout session.[232] The parties also agreed that IDT would purchase the IP Assets for $6 million, with Straight Path receiving a 22% contingent payment right (the "CPR") in net profits from those assets.[233] IDT's valuation of the IP Assets was pegged to the highest bid that Straight Path had received for those assets.[234]

### f. The Aftermath

On April 2, Evercore notified bidders that Straight Path and IDT had reached an agreement in principle regarding the Indemnification Claim.[235] On April 3, 2017, Straight Path's full board executed a unanimous written consent ratifying the Special Committee's power and authority to pursue and preserve the Indemnification Claim on behalf of Straight Path.[236] That document aimed to make this approval retroactive.[237]

On April 6, Straight Path agreed to an initial term sheet memorializing the settlement with Howard and IDT.[238] That day, Evercore received revised bids from AT&T and Verizon of $951.2 million and $1.028 billion, respectively.[239] The

---

[232] PTO ¶ 169.
[233] *Id.*; JX517.0006. Despite the Special Committee's disinterest in non-cash consideration, Howard would not budge from $10 million, leading to the CPR as a "deal-closer." TT (Fortinsky) 2322:20–22, 2323:8–11.
[234] TT (Weld) 1806:11–22; TT (Todd) 1257:20–1258:5.
[235] JX472.0003.
[236] JX476.0001–02.
[237] *Id.* at -0002.
[238] JX492.
[239] PTO ¶ 173.

following day, as bids continued to increase,[240] IDT requested that the term sheet be made binding in case a more detailed settlement was never reached.[241] The Special Committee sought additional consideration based on their belief that the increasing bids for Straight Path were driving up the value of the Indemnification Claim.[242] Cyrulnik's response, which threatened the Committee members and their counsel with malpractice and director liability,[243] led the Special Committee to give in once more.[244] Straight Path publicly announced the terms of the settlement in an 8-K filed April 9.[245]

### g. The Acquisition

Straight Path announced a final deal with AT&T on April 10 at a price of $1.6 billion.[246] However, ten days later, Verizon made an unsolicited offer of $1.8 billion, leading to a bidding war between the telecom giants.[247] Verizon eventually prevailed with a bid of *$3.1 billion*.[248] The sale premium of over 400% represented an extraordinary windfall for Straight Path stockholders.[249]

---

[240] *Id.* ¶ 174.
[241] JX588.0066; TT (Fortinsky) 2327:19–2328:11.
[242] JX509; PTO ¶ 176.
[243] JX509.
[244] JX517; PTO ¶ 177.
[245] JX535.
[246] *See* JX531.0001–02.
[247] JX577.0077–80.
[248] *Id.*; JX560.
[249] JX564.0003.

On May 11, 2017, Straight Path and Verizon executed a merger agreement.[250] That agreement required Straight Path to use reasonable best efforts to consummate the settlement term sheet it had entered with IDT.[251] That was achieved through a long-form settlement agreement entered on October 24, 2017.[252]

*C. Procedural History*

The original complaint in this matter was filed on July 5, 2017.[253] On July 24, 2017, I denied expedition and consolidated related matters into this action.[254] On July 26, Plaintiffs dismissed the Special Committee members without prejudice.[255] Plaintiffs filed an amended complaint on August 29, bringing four causes of action against Howard, Davidi, IDT, and the Trust.[256] A confidential mediation took place on June 14, 2018.[257] The Defendants moved to dismiss and, following briefing, I heard argument on those motions on November 3, 2017.[258] In my November 20,

---

[250] JX566.
[251] *Id.* at -0049.
[252] JX625.
[253] Verified Class Action and Deriv. Compl. for Breach of Fiduciary Duties, Dkt. No. 1.
[254] *See* July 24, 2017 Telephonic Oral Arg. Pls.' Mot. for Expedited Proceedings and Rulings of the Ct., 14:13–22 (granting consolidation), 37:9–11 (denying expedition), Dkt. No. 44.
[255] Granted (Stipulation and [Proposed] Order of Dismissal of Certain Defs. Without Prejudice), Dkt. No. 37.
[256] *See* Verified Consolidated Am. Class Action and Deriv. Compl., Dkt. No. 62. ("Compl.")
[257] Transmittal Decl. of Daniel E. Kaprow, Esq., pursuant to 10 *Del. C.* § 3927 in Supp. of IDT Defs.' Opp'n to Pls.' Mot. for Class Certification, Ex. 8, Dkt. No. 434.
[258] Judicial Action Form. Oral Arg. Held 11-3-17 on Defs.' Mot. to Dismiss, Dkt. No. 98.

2017 Letter Opinion, I held that the matter was not ripe pending the merger closing.[259] On March 2, 2018, Plaintiffs informed me that the merger had closed.[260]

On June 25, 2018, *Straight Path I* dismissed as moot an alternative cause of action for declaratory judgment and imposition of a constructive trust but allowed the three fiduciary duty claims to proceed.[261] This decision was affirmed on February 22, 2019, by the Delaware Supreme Court following an interlocutory appeal by the Defendants.[262]

Plaintiff Ardell Howard moved to intervene on October 14, 2020.[263] Following briefing and oral argument I granted that motion.[264]

The IDT Defendants (comprised of Howard, IDT, and The Patrick Henry Trust) and Davidi filed separate motions for summary judgment on July 6, 2021.[265] Briefing for those motions was completed in late August.[266] Briefing on class certification was completed in October 2021.[267] I heard combined oral argument on

---

[259] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2017 WL 5565264, at *3 (Del. Ch. Nov. 20, 2017).

[260] Letter to Vice Chancellor Sam Glasscock III from Ned Weinberger, Esq., Dkt. No. 105.

[261] *See In re Straight Path Commc'ns Inc. Consol. S'holder Litig*., 2018 WL 3120804, at *13–20 (Del. Ch. June 25, 2018), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019) ("*Straight Path I*").

[262] *See IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019).

[263] *See* Mot. to Intervene or for Permissive Joinder with Certificate of Service, Dkt. No. 339.

[264] Tr. of 7.20.21 Ct.'s Ruling on Mot. to Intervene and Scheduling Conference 4:2–6:16, Dkt. No. 498.

[265] *See* Def. Davidi Jonas's Mot. for Summ. J., Dkt. No. 439; IDT Defs.' Mot. for Summ J., Dkt. No. 440.

[266] *See* Reply Br. in Supp. of Def. Davidi Jonas's Mot. for Summ. J., Dkt. No. 508*; see also* Reply Br. in Further Supp. of IDT Defs.' Mot. for Summ. J., Dkt. No. 509.

[267] *See* Pls.' Sur-Sur-Reply Br. in Further Supp. of Mot. for Class Certification, Dkt. No. 525.

both class certification and summary judgment on November 9, 2021.[268] My decisions in *Straight Path II*[269] and *III*[270] denied the summary judgment motions in full and approved class certification, respectively. On August 12, 2022, Plaintiff reached a settlement with Davidi,[271] which I subsequently approved.[272] Trial was split into two five-day segments beginning on August 29 and December 5, 2022.[273] Post-trial briefing was completed on April 28, 2023[274] and, following oral argument on May 3, 2023, I took the matter under advisement.[275]

## II. ANALYSIS

Following motion practice and settlement, two causes of action remain before me: a claim for breach of the duty of loyalty against Howard and The Patrick Henry Trust as Straight Path's controlling stockholders (Count I);[276] and a claim for aiding and abetting that breach of duty pled against IDT (Count III).[277]

---

[268] *See* Tr. of 11.9.21 Oral Arg. re Mot. for Class Certification, Class Representatives, and Mots. for Summ. J., Dkt. No. 531.

[269] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2022 WL 484420 (Del. Ch. Feb. 17, 2022) ("*Straight Path II*").

[270] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2022 WL 2236192 (Del. Ch. June 14, 2022) ("*Straight Path III*").

[271] *See* Stipulation and Agreement of Settlement, Compromise, and Release with Def. Davidi Jonas, Dkt. No. 648.

[272] *See* Tr. of 12-22-2022 Partial Settlement Hrg. and Rulings of the Ct., Dkt. No. 751.

[273] *See* 8-29-2022 Trial Tr., Dkt. No. 702; Trial dated 12.5.22, 12.6.22, 12.8.22, 12.9.22, 12.12.12, Dkt. No. 735.

[274] *See* IDT Defs.' Corrected Answering Post-Tr. Br., Dkt. No. 773.

[275] Post Trial Oral Arg., Dkt. No. 776.

[276] Compl. ¶¶ 120–24; PTO ¶ 3.

[277] Compl. ¶¶ 130–33; PTO ¶ 3.

The central theory of Plaintiff's case is that the FCC investigation of Straight Path is attributable to pre-spin-off violations of FCC rules by IDT, making the penalties paid under the Consent Decree indemnifiable under the terms of the S&DA. Per Plaintiff, Howard recognized this as a threat to his family's substantial interest in IDT and used his control of Straight Path to wrest the Indemnification Claim away at an unfair price. While much of Plaintiff's theory is vindicated on the post-trial record, recovery is ultimately undermined by the Indemnification Claim's lack of viability.

## A. Defendants' Attack on Direct Standing Fails

Defendants begin by challenging Plaintiff's standing to assert direct claims.[278]

The wrongful selling of a corporate asset too cheaply is a classic claim belonging to the company; if it is to be asserted by a stockholder, it must be derivatively. And such a litigation asset would typically belong to a buyer after a corporate sale. I will not repeat here my pleadings-stage analysis that this case represented a material diversion of sales proceeds, and thus that Plaintiff's claims

---

[278] Defendants challenge the direct nature of Plaintiff's claims around both the IP Assets and the Indemnification Claim. IDT Defs.' Opening Post-Trial Br. 142–43, Dkt. No. 759 ("DF PTOB"). While Plaintiff's answering brief provides a compelling defense of the Indemnification Claim, it is silent as to the IP Assets. *See* Pl.'s Post-Trial Answering Br. 10–22, Dkt. No. 768 ("PL PTAB"). Accordingly, I find that Plaintiff has waived argument as to the IP Assets. *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.") (citation omitted). My remaining analysis therefore focuses exclusively on the Indemnification Claim.

were direct under *Parnes*; those interested should consult *Straight Path I*.[279] On Defendants' interlocutory appeal, the Supreme Court affirmed this holding.[280] That finding is now the law of the case.[281] However, this doctrine "is neither inflexible nor an absolute bar to reconsideration of a prior decision that is 'clearly wrong, produces an injustice, or should be revisited because of changed circumstances.'"[282]

Defendants' principal argument is that trial showed that the S&DA's anti-assignment provision made the proposed litigation trust structure a legal impossibility.[283] Because, per Defendants, the trust structure was not viable, the Indemnification Claim could not have been withheld in the merger, and could not represent a viable diversion of merger proceeds. No party has asserted that the indemnification asset could have been monetized in the sale of the Company. It follows that the claim's sale to Howard did not impact the total merger consideration, undermining the basis for Plaintiff's direct standing under *Parnes*.[284]

---

[279] *Straight Path I*, 2018 WL 3120804, at *13; *see Parnes v. Bally Ent. Corp.*, 722 A.2d 1243 (Del. 1999).

[280] *See IDT Corp.*, 206 A.3d 260.

[281] *See Carlyle Inv. Mgmt. L.L.C. v. Moonmouth Co. S.A.*, 2015 WL 5278913, at *7 (Del. Ch. Sept. 10, 2015) (describing law of the case doctrine in the context of a proceeding before one court, rather than on remand).

[282] *Id.* (quoting *Advanced Litig., LLC v. Herzka*, 2006 WL 2338044, at *5 (Del. Ch. Aug. 10, 2006)).

[283] *See* DF PTOB 142–43. Defendants also argue that the trust structure was a practical impossibility. DF PTOB 143–44; IDT Defs.' Corrected Answering Post-Trial Br. at 10–22, Dkt. No. 773 ("DF PTAB"). However, law of the case doctrine applies to *legal*, rather than *factual* issues. *Advanced Litig., LLC*, 2006 WL 2338044, at *5. Accordingly, I will address these factual arguments in my entire fairness analysis, to which they are pertinent.

[284] *See In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3599809, at *2 (Del. Ch. July 26, 2018).

43

Because the anti-assignment provision does not preclude the litigation trust structure, Defendants' argument fails as a matter of law. Section 11.05(b) of the S&DA states that neither Straight Path nor IDT "may assign its rights or delegate any of its duties under this Agreement without the prior written consent of the other Party."[285] Defendants' argument that this language is dispositive boldly cites no legal authority.[286] In doing so, it ignores that Delaware courts, following the Restatement (Second) of Contracts, "generally construe such [anti-assignment] provisions narrowly" by "distinguish[ing] between the *power* to assign and the *right* to assign."[287] In order to prohibit a party's power to assign, a provision must expressly state that subsequent assignments will be void or invalid.[288] Because the anti-assignment provision in the S&DA contains no such statement,[289] it does not preclude the litigation trust structure *as a matter of law*.[290] The matter of IDT's probable refusal to consent to any assignment, and whether that would have prevented recovery against IDT, does figure in the analysis of fair price, *infra.*

---

[285] JX107.0030.

[286] *See* DF PTOB 142–43.

[287] *Se. Chester Cnty. Refuse Auth. v. BFI Waste Servs. of Pa., LLC*, 2017 WL 2799160, at *5 (Del. 2017) (emphasis in original).

[288] *Id.* (holding that absent such a provision, parties retain the power to assign, though assignments may result in a breach of contract action by their counterparty).

[289] JX107.0030.

[290] *See* Pl.'s Post-Trial Answering Br. at 13–15, Dkt. No. 769 ("PL PTAB") (arguing that the contemplated structure involved a contractual arrangement with the acquirer, rather than an assignment of rights or duties).

## B. Entire Fairness Review Applies

Defendants effectively concede that Howard was Straight Path's controlling stockholder and, putting aside their argument on standing, that entire fairness review applies.[291] Given that Howard controlled more than 70% of Straight Path's voting power as of the March 29 meeting,[292] and given his involvement in the process, I find that he was a controller owing fiduciary duties to the company's minority stockholders.[293] Plaintiff alleges that Howard breached his duty of loyalty to the minority stockholders by coercing the Special Committee into an unfair settlement of the Indemnification Claim, resulting in a non-ratable benefit to Howard.[294] Though Howard's personal stake in Straight Path was smaller than in IDT, the Jonas family collectively owned a larger stake in IDT, as of March 29, 2017.[295] I find that IDT's status as Howard's flagship company,[296] his family's larger ownership stake, and ongoing interest in IDT post-merger are sufficient to establish a non-ratable benefit.[297]

---

[291] *See* DF PTOB 144–73; DF PTAB 22–119 (failing to contest the issue of control or the application of entire fairness).

[292] JX739.0064.

[293] *See Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006) (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113–14 (Del. 1994)) (holding that an individual or entity holding 50% or more of a corporation's voting power is a controller); *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (holding that controllers owe fiduciary duties). Given Defendants' waiver of the control argument, I need not assess whether the existence of the Patrick Henry Trust impacts this analysis.

[294] PL PTOB 69.

[295] JX739.0060–67.

[296] TT (Howard) 970:13–972:9; *see also* TT (Weld) 1740:10–11; TT (Todd) 1272:19–1273:11.

[297] TT (Atkins) 2644:21–2648:6; JX0739.0035–48.

45

Accordingly, entire fairness review applies,[298] with the burden on Defendants to demonstrate both fair process and fair price.[299]

### 1. Fair Process

Fair process "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[300] This Court is frequently asked to make findings of controller overreach based on only circumstantial evidence, cryptic communications, or inference.[301] This is not one of those cases. Here, Howard, directly and through Cyrulnik, made every effort to bully the Special Committee towards his desired outcome.

Howard did not want the Indemnification Claim preserved.[302] In order to push his agenda, he bombarded the Special Committee members with phone calls.[303] He described as "insane" Shearman's reasonable precaution of walling off "the controlling shareholder" from communicating with "his own directors" about a pending self-interested transaction.[304] He threatened to "put it all on Mintz

---

[298] *See Straight Path I*, 2018 WL 3120804, at *15.
[299] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d at 700.
[300] *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).
[301] *See, e.g., In re Oracle Corp. Deriv. Litig.*, 2023 WL 3408772 (Del. Ch. May 12, 2023).
[302] *See, e.g.,* JX588.0062 (describing, in a signed SEC disclosure, how Cyrulnik told Fortinsky that Howard was not prepared to support a potential transaction in which the Indemnification Claim was preserved); TT (Fortinsky) 2272:5–15 (confirming the conversation); *see also* TT (Howard) 1177:20–1178:20.
[303] TT (Howard) 1026:4–1027:17; TT (Weld) 1965:11–1966:12.
[304] TT (Howard) 1146:4–23.

[Levin]"—the law firm where Weld was a partner—when Weld didn't cave in to his demands.[305] He verbally abused the Special Committee during negotiations, calling them "bullshit directors."[306] He made sure that the Special Committee knew, as they went into final negotiations, that he had dissolved his blind trust and retaken direct voting control of Straight Path.[307] Finally, he made the Special Committee believe that he would torpedo the lucrative sale of the Company, if the Special Committee did not quickly settle the Indemnification Claim.[308] This campaign of abuse and coercion led the Special Committee to reasonably conclude that it had to settle the Indemnification Claim on Howard's terms or risk an even less favorable outcome for the Company.[309]

In response to this overwhelming evidence of unfair process, Defendants attempt to turn the tables by putting the blame on the Special Committee. Defendants' argument, as I understand it, is essentially that the Special Committee went rogue and sought to preserve the Indemnification Claim despite blinding evidence that it was not in the company's best interests.[310] Per Defendants, Howard

---

[305] TT (Weld) 1967:11–1969:11.
[306] *Id.* at 1991:18–21; TT (Fortinsky) 2301:23–2302:7.
[307] TT (Weld) 2000:15–2001:1.
[308] JX588.0062 (describing Cyrulnik's conversation with Fortinsky); TT (Fortinsky) 2245:21–2246:6; TT (Fortinsky) 2274:9–12; *see also* TT (Fortinsky) 2271:17–2272:2; TT (Weld) 1985:21–1987:14.
[309] TT (Weld) 1818:16–23, 1994:17–1995:11, 2007:6–9; TT (Todd) 1386:21–1387:11, 1390:2–1392:3, 1437:2–24; TT (Zeidman) 1671:23–1672:12.
[310] DF PTOB 169–73; DF PTAB 45–70.

was in fact *defending* minority stockholder interests by steamrolling the Special Committee.[311]  I find that this fulsome[312] defense of Howard's clear interference with the Special Committee is facially inconsistent with both Delaware law and the factual record.

This Court presumes directors' fidelity to their fiduciary duties.[313]  Defendants seek, explicitly or not, to justify the forceable substitution of Howard's business judgment for the Special Committee's own.  The burden is therefore on Defendants to establish facts rebutting this presumption of fidelity and justifying Howard's intervention.[314]  I find that they fall far short.  The record is replete with evidence that the Special Committee labored zealously to maximize stockholder value based on the members' good faith belief that the Indemnification Claim would be undervalued in a merger, as well as their understanding of Howard's intransigence.[315]

---

[311] *See, e.g.,* DF PTOB 170 (arguing that Howard acted to benefit Straight Path, never threatened anyone, and sought no non-ratable benefit).

[312] Fulsome, in the traditional sense.  *See Jeter v. RevolutionWear, Inc.*, 2016 WL 3947951, at *9 n.90 (Del. Ch. July 19, 2016); *see also* Cyrulnik's impassioned closing defense of Howard at post-trial oral argument.  Post Trial Oral Arg. Tr. 158:2–62:3, Dkt. No. 780.

[313] *See Orman v. Cullman*, 794 A.2d 5, 19–20 (Del. Ch. 2002); *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049–50 (Del. 2004) (applying this principle in the context of demand futility).

[314] *Orman*, 794 A.2d at 19–20.

[315] *See, e.g.,* TT (Todd) 1380:19–1381:16 (stating that eliminating the Indemnification Claim would be beneficial for the sales process); TT (Weld) 1952:2–1953:13 (expressing that potential buyers would not have interest in the Indemnification Claim); TT (Fortinsky) 2238:18–2239:8 (asserting that the Special Committee stated "buyers would not pay anything for the Indemnification Claim"); TT (Weld) 1835:16–1836:2, 1836:12–21, 1994:17–21, 2004:7–15

48

Defendants' principal argument to the contrary is that Howard's actions were taken in good faith and were consistent with advice from Straight Path's deal advisors at Weil and Evercore.[316] As a threshold matter, it is irrelevant whether Howard had a subjective good faith belief that coercing the Special Committee into a settlement was in Straight Path's best interest.[317] Instead, Defendants' only relevant contention is that the advice of Weil and Evercore rebuts the presumption that the Special Committee was carrying out its duties in good faith, necessitating Howard's intervention.[318] However, this argument is not borne out by the evidence.

---

(revealing the committee needed to settle the Indemnification Claim or the transaction would not go forward and that stockholders would receive little for the claim if Howard removed independent directors from the board); TT (Todd) 1312:2–24, 1313:1–13, 1387:23–1389:5, 1389:18–1390:12 (stating that the financial interests of all stockholders were going to be negatively impacted); TT (Fortinsky) 2298:17–2299:13 (expressing that he did not believe Howard would allow the Indemnification Claim to survive a Straight Path transaction); TT (Weld) 2008:19–2009:12 (asserting that the Indemnification Claim was sacrificed to allow the transaction to go forward); *see also* TT (Weld) 2007:10–12, 1962:5–12 (stating the Indemnification Claim was settled for a low amount).

[316] DF PTOB 169–71. I have found, *supra*, that Howard had a large and compelling familial interest in IDT, I need not address further Defendants' arguments that Howard's financial interests aligned with those of the minority. *See* DF PTOB 172–73. I also defer until the next section consideration of Defendants' fair price arguments, which they attempt to inject into the fair process analysis. *See* DF PTAB 26–40.

[317] *See In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 489 (Del. Ch. 2013) (holding that fiduciaries are liable for unfair self-dealing, regardless of whether they acted in subjective good faith). Indeed, the idea that "fair process" can be fulfilled by a controller's "good faith" steamrolling of a functioning special committee is non-intuitive and deviant from our doctrine. Perhaps this is why Defendants cite no relevant precedent in arguing fair process. *See* DF PTOB 169–73 (citing only two cases, both inapposite); DF PTAB 40–68 (citing only a single case, also inapposite, in almost 30 pages of argument).

[318] Defendants attempt to cast doubt on the Special Committee's understanding of its duties through artfully selected and ordered selections of trial testimony. DF PTAB 35–37. I find, however, that this evidence does little to rebut the presumption of the Special Committee's adherence to its fiduciary duties. As such, I decline to address these arguments further.

Neither Straight Path's deal advisors nor the bidders ever intimated that preservation of the Indemnification Claim would "imperil[] the auction[.]"[319] Weil and Evercore's belief that resolving the Indemnification Claim would make for a smoother auction process is insufficient to impugn the Special Committee or justify Howard's interference.

Accordingly, I find that Defendants failed to demonstrate fair process.

### 2. Fair Price and the Value of the Indemnification Claim Based on the Trial Record

In assessing fair price, the Court must determine whether Defendants have proved that the price paid for the Indemnification Claim "falls within a range of fairness."[320] Contrary to Defendants' contentions, the price in question is the consideration Howard paid in exchange for settlement of the Indemnification Claim, *not* the $3.1 billion Verizon paid for Straight Path.[321] Plaintiff accurately summarizes the analysis as follows: "[t]o determine 'fair price,' the Court must decide whether Defendants proved that the Indemni[fication] Claim was worthless or of so little value that $10 million fails within a range of fairness for this massive

---

[319] DF PTOB 169; *see* TT (Evercore) 3013:23–3015:9; TT (Breau) 2469:11–2474:9; JX720.0166 (Weil Designations) 166:3–25; JX688.0187 (Verizon Designations) 187:22–188:07, 194:06–195:06; 215:09–23.
[320] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *33 (Del. Ch. Aug. 27, 2015).
[321] DF PTOB 145.

shortfall."[322]  The following section, accordingly, addresses a counterfactual: if IDT had not obtained a release of the Claim, what would its value be to the Plaintiff class?

Because I find that Straight Path's failure to fulfill the notice and consent requirements of Section 6.07 of the S&DA is dispositive in determining that the Indemnification Claim was economically worthless, I need not rule on many of the parties' other threshold arguments.[323]  In order to give the reader context, I briefly outline these arguments before analyzing the issue of notice and consent in detail.  I then address Plaintiff's arguments around contribution, which she contends provides an equitable path towards recovery not subject to the notice and consent requirements of S&DA Section 6.07.  Because Plaintiff's arguments are not supported by equity, they do not sway my finding that the $10 million paid by Defendants was fair.  My reasoning follows.

> a. SPCI Liability, Pre- or Post-Spin-Off, Indemnifiable Loss, Limitation on Liability

Defendants field a host of arguments that the price paid was more than fair because the Indemnification Claim was not viable.  For the purposes of the fair price analysis, I either find or assume that Plaintiff prevails on each of the arguments discussed in this subsection.

---

[322] PL PTAB 61.
[323] Accordingly, because I find that the $10 million paid was economically fair, I need not assess the value of the CPR that stockholders obtained in the settlement with Howard and IDT.

### i. Indemnifiable Loss

Section 6.02 of the S&DA governs IDT indemnification of Straight Path (or "SPCI") and is the basis for the Indemnification Claim. That section reads:

> On and after the Distribution Date, IDT shall indemnify, defend and hold harmless SPCI and its subsidiaries and each of their respective directors, officers, employees and agents (the "SPCI Indemnitees") from and against any and all Indemnifiable Losses incurred or suffered by any of the SPCI Indemnitees and arising out of, or due to, (a) the failure of IDT or any member of the IDT Group to pay, perform or otherwise discharge, any of the IDT Liabilities, and (b) any breach by IDT or any member of the IDT Group of this Agreement.[324]

Defendants argue that, because Straight Path received the Spectrum Licenses for free in the spin-off, there can be no Indemnifiable Loss,[325] which is defined as "any and all damage, loss, liability, and expense. . . in connection with any and all"[326] actual or threatened claims, proceedings, or investigations before any court or government agency.[327] Defendants cite no authority, legal or otherwise, nor do they attempt to reconcile their position's clear conflict with the language of the S&DA. Accordingly, I find that the Consent Decree gave rise to an Indemnifiable Loss under the S&DA.

### ii. Limitation of Liability

---

[324] JX107.0019.
[325] DF PTOB 155–56.
[326] JX107.0006.
[327] *Id.* (defining "Action").

Section 11.12 of the S&DA contains a provision limiting indemnitors' liability for "any special, indirect, incidental, punitive, consequential, exemplary, statutorily enhanced or similar damages in excess of compensatory damages[.]"[328] Defendants contend that the damages here are consequential and that there can be no compensatory damages, given that Straight Path received the Spectrum Licenses for free.[329] In doing so, Defendants ignore the subsequent parenthetical noting that "any such liability with respect to a Third Party Claim shall be considered direct damages."[330] As Plaintiff notes, "[a] plain reading of [Section] 11.12 and the S&DA's definitions confirm that liability resulting from a Consent Decree is the result of a 'Third Party Claim[.]'"[331] Accordingly, Defendants' limitation of liability argument fails.

### iii. SPCI Liabilities

The parties next dispute whether Plaintiff's claimed losses are "SPCI Liabilities" as defined in the S&DA.[332] This is relevant because SPCI Liabilities are specifically carved out from IDT's indemnification obligations in Section 6.02.[333] The definition of "SPCI Liabilities" is complex, involving seven subparts and

---

[328] JX107.0032.
[329] DF PTOB 156–58.
[330] JX107.0032.
[331] PL PTAB 98.
[332] PL PTOB 105–10; PL PTAB 69–80; DF PTOB 150–55; DF PTAB 88–97.
[333] JX107.0005 (carving "SPCI Liabilities" out from "IDT Liabilities"), -0030 (linking one category of indemnity to IDT Liabilities).

ambiguity resulting from an obvious drafting error.[334]  Of these seven subparts, only numbers (ii), (iv), and (vii) are the subject of the parties' post-trial arguments.

Subpart (ii) attempts to use time-based limitations to determine whether a given liability is an SPCI Liability.[335]  While the first half of the provision[336] allocates liabilities arising after the spin-off to Straight Path, the second half appears to also allocate *pre*-spin-off liabilities to Straight Path, but the language is ambiguous due to a missing parenthesis and the use of what appears to have been intended as a defined term, "Effective Date," that appears nowhere else in the S&DA.[337]  I assume for the purpose of this fair price analysis that Plaintiff's preferred reading of subpart (ii), allocating to Straight Path only those liabilities arising from *post*-spin-off conduct,[338] is correct.

I found on summary judgment review that the language of subpart (iv) (which excludes from indemnification liabilities arising from "a sale") was unambiguous

---

[334] *Id.* at -0009–10.

[335] *Straight Path II*, 2022 WL 484420, at *9–11.

[336] "[A]ny and all Liabilities of IDT, SPCI, or any of their respective Affiliates, primarily relating to, arising out of or resulting from the operation or conduct of the SPCI Business or any other business, or the ownership or use of the Assets of SPCI, as conducted at any time on or after the Effective Time." JX107.0009.

[337] *Id.*

[338] PL PTOB 105–10 (emphasis added).

but inapplicable to Plaintiff's claims.[339] I reject as inadequate Defendants' attempts here to overcome the law of the case.[340]

Finally, Defendants argue that subpart (vii), which governs liabilities relating to post-spin legal actions, controls Plaintiff's claims.[341] Subpart (vii) includes a time-based limitation similar to subpart (ii) and applies to liabilities relating to the operation of the SPCI Business and any SPCI Action.[342] The S&DA defines "any SPCI Action" as "any current or future Action relating primarily to the SPCI Business in which one or more members of the IDT Group is a defendant or the party against whom a claim or investigation is directed. . . ."[343] Defendants contend subpart (vii) applies to Plaintiff's claims since Plaintiff asserts the FCC Straight Path Inquiry was directed against IDT's conduct.[344] Based on this interpretation, Defendants argue subpart (vii) designates the FCC Straight Path Inquiry as an "SPCI Action," and, as a consequence, allocates liability to Straight Path.[345] I assume for the purposes of this analysis that Plaintiff's position—that subpart (vii) is inapplicable

---

[339] *See Straight Path II*, 2022 WL 484420 at *10.
[340] *See, e.g.,* DF PTAB 99–101 (seemingly arguing that trial introduced new evidence inconsistent with my prior decision, but failing to explain how this overcomes the law of the case doctrine); *see also* Section III.A (discussing law of the case doctrine).
[341] DF PTOB 153–55.
[342] "[A]ny and all Liabilities relating to, resulting from, or arising out of any Action that is primarily related to the operation of the SPCI Business following the Effective Time, including any SPCI Action." JX107.0010.
[343] *Id*. at -0008.
[344] DF PTOB 153.
[345] *Id.*

because it allocates liability to Straight Path for IDT's *post*-spin-off conduct and not *pre*-spin-off violations—is correct.[346]

### iv. Pre- or Post-Spin-Off

Defendants next argue that, even under Plaintiff's reading of the S&DA, the penalties Straight Path paid under the Consent Decree are not indemnifiable because they are attributable to *post*-spin-off conduct,[347] putting them on the wrong side of subpart (ii)'s time-based liability allocations. As the facts recited above indicate, most—but not all—of the actions cited by the FCC in its investigation involve pre-spin activity. I once again assume without finding that Plaintiff's position—that the FCC investigation and subsequent Consent Decree arose from IDT's pre-spin-off violations—is correct.

### b. Notice & Consent

I turn, then, to whether Straight Path created a viable indemnification obligation on the part of IDT, under the terms of the S&DA. Defendants contend that the Indemnification Claim was worthless because it was barred by Section 6.07 of the S&DA, governing notice and defense of third-party claims.[348] At summary judgment, I warned that Plaintiff's theory of implied consent "may prove difficult to vindicate on the facts alleged."[349] On a post-trial record, I find that Defendants

---

[346] PL PTAB 82–83 (emphasis added).
[347] *Id.* at 158–65.
[348] PTOB 145–49; JX107.00021–22.
[349] *Straight Path II*, 2022 WL 484420, at *11.

proved that the notice and consent requirements of Section 6.07 were not met and

that Plaintiff's theories were not tenable.

### i. Requirements under Section 6.07

Section 6.07 provides:

Promptly following the earlier of (a) receipt of notice of the commencement by a third party of any Action against or otherwise involving any Indemnified Party or (b) receipt of information from a third party alleging the existence of a claim against an Indemnified Party, in either case, with respect to which indemnification may be sought pursuant to this Agreement (a "Third Party Claim"), the Indemnified Party shall give the Indemnifying Party written notice thereof. The failure of the Indemnified Party to give notice as provided in this Section 6.07 shall not relieve the Indemnifying Party of its obligations under this Agreement, except to the extent that the Indemnifying Party is materially prejudiced by such failure to give notice. Within thirty (30) days after receipt of such notice, the Indemnifying Party shall, by giving written notice thereof to the Indemnified Party, (a) acknowledge, as between the parties hereto, liability for, and at its option elect to assume the defense of such Third Party Claim at its sole cost and expense or (b) object to the claim of indemnification set forth in the notice delivered by the Indemnified Party pursuant to the first sentence of this Section 6.07 setting forth the grounds therefor; provided that if the Indemnifying Party does not within the same thirty (30) day period give the Indemnified Party written notice acknowledging liability or objecting to such claim and setting forth the grounds therefor, the Indemnifying Party shall be deemed to have acknowledged, as between the parties hereto, its liability to the Indemnified Party for such Third Party Claim. . . . If the Indemnifying Party assumes the defense of a Third Party Claim, the Indemnifying Party may settle or compromise the claim without the prior written consent of the Indemnified Party if such settlement or compromise is solely for monetary damages for which the Indemnifying Party shall be responsible for; in all other events, the Indemnifying Party may not agree to any settlement or compromise without the prior written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed. If the

Indemnifying Party does not assume the defense of a Third Party Claim for which it has acknowledged liability for indemnification under Article VI, the Indemnified Party may require the Indemnifying Party to reimburse it on a current basis for its reasonable expenses of investigation, reasonable attorney's fees and reasonable out-of-pocket expenses incurred in defending against such Third Party Claim, and the Indemnifying Party shall be bound by the result obtained with respect thereto by the Indemnified Party; provided that the Indemnifying Party shall not be liable for any settlement effected without its consent, which consent shall not be unreasonably withheld or delayed.[350]

The Section requires the "Indemnified Party" (here, Straight Path) to promptly notify the Indemnifying Party, IDT, in writing, upon receiving notice that a third party (a) has commenced an Action against or involving Straight Path or (b) has alleged the existence of such a claim.[351] Both (a) and (b) only apply to claims for "which indemnification may be sought" under the S&DA.[352] Failure to adhere to this notice requirement "shall not relieve [IDT] of its obligations under [the S&DA]," except to the extent such a failure materially prejudices IDT (the "Material Prejudice Carveout").[353]

Section 6.07 further requires IDT, within 30 days of receiving "such notice," to notify Straight Path in writing that IDT either (x) acknowledges its liability to Straight Path[354] or (y) objects to Straight Path's indemnification claim.[355] If IDT

---

[350] JX107.00021–22.
[351] *Id.* at -0021.
[352] *Id.*
[353] *Id.*
[354] This option, which only acknowledges liability "as between the parties," also gives IDT the option to assume the defense of the claim at its own expense. *Id.*
[355] IDT is also required to provide the grounds for rejection. *Id.*

does not provide this written notice within the 30-day period specified, it is deemed to have acknowledged its liability to Straight Path for the claim.[356]

Section 6.07 also provides that IDT, if it assumes the defense of the underlying claim by the third party, can settle that claim without consulting Straight Path where the settlement involves only money damages to be paid by IDT.[357] Otherwise, IDT may not settle a claim without Straight Path's prior written consent, which "shall not be unreasonably withheld or delayed."[358] Similarly, for claims where IDT has acknowledged liability but not assumed the defense, IDT "shall be bound by the result" obtained by Straight Path but will not be liable for settlements entered without its consent, which "shall not be unreasonably withheld or delayed."[359]

Here, Plaintiff seeks to recover for fines and license terminations under the Consent Decree Straight Path entered—settled—with the FCC.[360] It is largely undisputed that Straight Path did not follow the process described in Section 6.07 prior to entering the Consent Decree.[361] The operative question is therefore whether

---

[356] *Id.*
[357] *Id.*
[358] *Id.* at -0021–22.
[359] *Id.* at -0022.
[360] *See* PL PTOB 98–99.
[361] Plaintiff argues that Davidi provided written notice on behalf of Straight Path in a February 2016 email. PL PTOB 112. However, this email predates the FCC investigation that resulted in the Consent Decree. *See* JX199.0002 (FCC letter of inquiry dated September 20, 2016). I therefore find that it could not have fulfilled the requirements of Section 6.07 with regard to that settlement.

Plaintiff's alternative theories of notice and consent are permissible under the S&DA.

## ii. Notice Requirement

Reading Section 6.07 as a whole, the notice requirement serves two functions: to let IDT know that (1) a claim potentially giving rise to an indemnification obligation exists and (2) Straight Path intends to seek indemnification for that claim. An indemnitor can suffer material prejudice if it is held liable for a claim where it had notice of (1) but not (2). This is because the indemnitor's interest in defending against a given claim corresponds directly to the probability that it will be liable for payment. That probability is based on both the merits of the underlying claim and the likelihood that the indemnitee will seek indemnification. Thus (2) serves the important function of eliminating uncertainty around whether the indemnitee will seek indemnification, aligning the interests between indemnitee and indemnitor.

Plaintiff contends that Straight Path provided IDT with the contractually required notice of the FCC's impending inquiry and Straight Path's intention to seek indemnification from IDT in the event Straight Path was made to pay fines as a result of the FCC inquiry.[362] On February 26, 2016, Davidi sent an email to Schmuel, IDT's in-house counsel, and Cyrulnik, which stated, in relevant part, "According to a clause in the separation agreement (6.07 I believe) between [Straight Path] and

---

[362] PL PTOB 112–13.

IDT, IDT indemnifies [Straight Path] for activities prior to separation.  Given the posture of the claims against [Straight Path] to date that clause may be implicated."[363]  While Davidi requested a call in this email to discuss the issue further, no testifying witness recalled whether the requested call occurred.[364]  It is unclear from the text of the email whether Davidi's email was referencing indemnification from IDT for the ongoing *Zacharia* lawsuit Straight Path was a party to[365] or Straight Path's potential liability for the not-yet-opened FCC Straight Path Inquiry.[366]  I note that the latter was not a "claim[]. . . to date."[367]

Though Plaintiff points to IDT's October 2016 SEC filing that acknowledges "should the FCC impose liability on Straight Path, *we could be the subject of a claim from Straight Path related to that liability*"[368] as confirmation that IDT was properly put on notice by Straight Path, Plaintiff has been unable to adduce anything attributable to Straight Path which clearly puts IDT on notice that Straight Path would be seeking indemnification from IDT for any liabilities Straight Path incurred from the FCC Straight Path Inquiry.[369]  At best, the language in IDT's October 2016 SEC filing is evidence that IDT knew of the FCC Straight Path Inquiry and was

---

[363] JX0161.0001.

[364] TT (Davidi) 275:10–76:15; TT (Ash) 918:10–19:7; TT (Schwell) 2861:20–62:8; TT (Breau) 2418:6–14; TT (Schmuel) 2419:1–17.

[365] TT (Davidi) 55:1–5, 56:1–57:20, 269:23–271:9.

[366] *See* JX199 (September 2016 FCC Letter of Intent).

[367] *Id.*

[368] JX0237.0014, -0021, -0043 (emphasis added).

[369] *See* PL PTOB; PL PTAB.

anticipating Straight Path might provide IDT with notice for indemnification in the future.

The presence of function (2)—that Straight Path may seek indemnification—in Section 6.07's notice requirements is apparent in the option for the IDT to assume the defense of the claim and the requirement that the Straight Path obtain the IDT's consent before settling. These provisions would not make sense if notice included notice of a claim but not intent to demand indemnification, because IDT's decisions around the appropriateness of defense or settlement hinge on Straight Path's intent to seek indemnification. I find that Plaintiff's evidence fails demonstrate that IDT was aware Straight Path intended to seek indemnification for FCC-imposed liability.

Plaintiff argues next that the Material Prejudice Carveout excuses the lack of written notice. Per Plaintiff, the fact that IDT already had constructive and actual notice that Straight Path was planning to settle with the FCC, potentially opening the door to an indemnification claim, "preclude[s] a finding of material prejudice."[370] I find that this interpretation is inconsistent with the text of Section 6.07, as well as the facts of record.

It is indisputable that Howard, a conflicted fiduciary, was aware of and cooperated in Straight Path's response to and eventual settlement of the FCC

---

[370] PL PTAB 85.

investigation.[371] However, there is no evidence that, prior to that settlement, Straight Path provided appropriate notice to IDT that it was asserting its right to indemnification for the resulting liability. Deeming IDT to have notice of this Indemnification Claim would result in material prejudice to IDT because it did not have an opportunity to defend against the investigation or negotiate the settlement with the full knowledge of its liability.

At the time Straight Path agreed to this settlement with the FCC,[372] Straight Path was already preparing for a potential sale of its licenses after having been approached by potential buyers.[373] It strains credulity that IDT, being on notice of its need to potentially indemnify Straight Path, would have negotiated a settlement opting to remit to the FCC 20% of the proceeds from the sale of Straight Path's license portfolio without requiring any cap on the amount remittable to the FCC. Ultimately, Straight Path's liability to the FCC ballooned to a point that the face value of the Indemnification Claim exceeded not only IDT's ability to pay, but also IDT's liquidation value.[374]

Accordingly, I find that Defendants have shown that Straight Path failed to comply with the written notice requirement of Section 6.07, materially prejudicing

---

[371] *See, e.g.,* TT (Weld) 1947:11–23; JX0357.0001; TT (Fortinsky) 2234:5–35:22; TT (Davidi) 307:4–9:9; TT (Howard) 1001:3–1004:3, 1122:17–22.
[372] JX825.
[373] JX577.0065; TT (Weld) 1716:12–15.
[374] TT (Atkins) 2680:13–20.

IDT. Therefore, IDT cannot be deemed to have been on contractual notice of Straight Path's intention to seek indemnification for the FCC Straight Path Inquiry.

### iii. Consent

My finding that Straight Path failed to fulfill Section 6.07's notice requirement effectively moots the need to evaluate the parties' consent arguments. This is because the consent requirement is predicated on IDT's acknowledgement of liability, which itself requires notice.[375] However, for the sake of completeness, I briefly address the consent arguments here, which would independently negate the Indemnification Claim.

Plaintiff's principal argument on consent is that IDT impliedly consented to indemnification.[376] Per Plaintiff, because "[t]he S&DA does not proscribe any formal requirements for the indemnifying party's consent to a settlement," Howard's knowledge of and lack of objection to Straight Path's settlement with the FCC is

---

[375] JX107.0021–22.

[376] PL PTOB 114–17. Plaintiff also contends that IDT "relinquished any consent right" by denying that it had any indemnity obligations relating to the Consent Decree. *Id.* at 113–14. This argument is based on a strained reading of Section 6.07, which deems the indemnitor to acknowledge liability if it doesn't respond to the indemnitee's notice within 30 days. JX107.0021. Plaintiff takes this to mean that, by not responding, the indemnitor waives its *consent* right. PL PTAB 86–87. However, Section 6.07 deems the unresponsive indemnitor to have "acknowledged. . . liability[,]" which is precisely the phrase used when describing the scenario in which the consent right arises. JX107.0021–22. Thus, it is clear that the parties intended that an unresponsive indemnitor could be deemed to have acknowledged liability but retain its consent right when it came to subsequent settlements. In any event, I have found contractual notice lacking here, and only "such notice" triggers IDT's obligation to "acknowledge" the obligation to indemnify.

sufficient to constitute consent.[377]  In further support of this argument, Plaintiff points to Straight Path and IDT's allegedly overlapping legal teams that coordinated the response to the FCC.[378]  At most, this evidence indicates that IDT had knowledge of Straight Path's response to the FCC inquiry; it does not indicate that IDT was aware that Straight Path would seek indemnification or that IDT was consenting to indemnifying Straight Path.  This argument fails for the same reasons as the Plaintiff's contentions around notice.

Alternatively, Plaintiff argues that IDT waived its right to consent to any settlement Straight Path reached in resolving the FCC Straight Path Inquiry.[379]  In asserting this argument, Plaintiff is trying to have her cake and eat it too.  Plaintiff has asked that this Court eliminate the requirement in Section 6.07 that Straight Path's notice be in writing because the notice was *implied*, while also asking that this Court to find that IDT waived its consent right for not strictly adhering to the S&DA's requirement that IDT respond in writing within 30 days of receiving

---

[377] PL PTOB 114–16.  Plaintiff asserts that Howard's alleged willingness to help Straight Path finance any penalty assessed by the FCC as further evidence of IDT consenting to indemnify Straight Path.  PL PTAB 84, 92.  While Howard is IDT's controlling stockholder, Howard lacks the authority to unilaterally consent to indemnifying Straight Path.  TT (Ash) 825:24–826:22 (explaining that indemnifying Straight Path qualified as a related-party transaction and would therefore require independent board approval by IDT).

[378] *See* PL PTOB 115–16 (pointing out that (i) Cyrulnik reviewed the draft Consent Decree while simultaneously representing both Straight Path and IDT and (ii) Cyrulnik and Schwell attended the Straight Path board members where the negotiations with the FCC were discussed and the Consent Decree was ultimately approved, as evidence that IDT had *impliedly* consented); PL PTAB 90.

[379] *Id.* at 113–14; PL PTAB 86–89.

notice.[380]  Under Plaintiff's reading of the S&DA, if IDT did not acknowledge liability, IDT would waive its right to consent, but Straight Path could still seek indemnification from IDT for any settlement, even a settlement reached without IDT's receipt of written notice.[381]  Plaintiff further argues that IDT's alleged failure to acknowledge liability meant "that IDT disclaimed indemnity and thereby relinquished any consent right."[382]

Despite Plaintiff's best efforts to force IDT into strict compliance with the S&DA's requirements while simultaneously holding Straight Path to a lesser standard, I find Plaintiff's interpretation of the S&DA untenable.  It is only Straight Path's written notice that can trigger IDT's concomitant responding obligation, but IDT never received a writing that met S&DA's requirements.  Here, there could be no waiver of IDT's consent right and, as discussed *supra* in Section II.B.2.b.ii., the argument that IDT would sit on its consent rights while Straight Path settled the FCC Straight Path Inquiry for an unknown amount that was inherently connected with the sale of Straight Path's licenses, which quickly skyrocketed to a record sale premium, is unfounded.

My decision not to defer to Plaintiff's interpretation of Section 6.07 is further supported by the record, which I find is replete with evidence that Straight Path was

---

[380] JX0107.0021–22.
[381] PL PTOB 113.
[382] *Id.* at 114.

66

impatient to resolve the FCC inquiry by entering the Consent Decree, at the expense of running afoul of Section 6.07 in the S&DA. For instance, Weld, Straight Path's director, agreed it was "preferable to get a clean bill of health from the FCC for its licenses before it was going to entertain serious discussions with anyone about buying the company."[383] Additionally, Todd, another Straight Path director, expressed "the idea was, we needed to get this resolved as quickly as we could, because any buyer is going to be hesitant to buy something that's flawed."[384] Zeidman, yet another Straight Path director, declared ". . . if they had revoked all our licenses, there would have been nothing to transfer to an AT&T or anybody else. So[,] I think it was sort of mandatory that we resolve the issue."[385] Finally, Breau, Straight Path's General Counsel, stated Straight Path was "very focused on resolving the FCC's inquiry."[386]

Further, I find that the record also demonstrates that Straight Path deliberately avoided the formalities of Section 6.07, by failing to provide IDT with adequate notice as required by the S&DA. For example, Davidi, Straight Path's CEO and a director, asserted that Straight Path considered involving IDT in the FCC negotiations, but Straight Path eventually determined "it would be likely fatal to our

---

[383] TT (Weld) 1716:16–1717:12.
[384] TT (Todd) 1212:5–1213:2.
[385] TT (Zeidman) 1513:3–6.
[386] TT (Breau) 2370:19–21.

objective of achieving resolution with the FCC to invite IDT to participate; and so[,] we did not."[387] Zeidman also expressed that Straight Path did not seek IDT's consent for the FCC settlement because Straight Path "felt that it was an independent decision by Straight Path, and we had no reason to get consent of anyone – of anyone other than the board, if you will, of Straight Path."[388] Further, Frank Lamancusa, Straight Path's outside counsel, stated he did not "have any recollection that. . . [IDT was]. . . aware of the settlement discussion."[389]

In short, Straight Path failed to provide IDT with written notice pursuant to the S&DA. While IDT was well aware of the FCC's inquiry into Straight Path, it was unaware that Straight Path intended to seek indemnification. IDT was not on notice and, therefore, was not given the opportunity to exercise its contractual right to take over the defense of the inquiry nor allowed to meaningfully participate in the negotiations with the FCC. Even after Straight Path negotiated a settlement with the FCC, I find, Straight Path failed to provide IDT the option of approving the terms of the settlement *because it was not in Straight Path's interest to do so*. Straight Path much preferred to allow the "golden chicken" (to use Shmuel's memorable phrase) that was the sales auction to keep laying, instead of allowing IDT the ability to assume the defense of claim or change the terms of the settlement, interfering with

---

[387] TT (Davidi) 120:12–22.
[388] TT (Zeidman) 1525:24-1527:6.
[389] TT (Lamancua) 478:10–14.

68

the ovulatory process. Allowing IDT to have a say in the FCC Straight Path Inquiry risked delaying or harming the highly lucrative sales process. This was a reasonable decision on the part of Straight Path, and paid off handsomely for its stockholders, but it is inconsistent with indemnification.

Straight Path's failure to comply with the notice and consent requirements of Section 6.07 of the S&DA fatally undermines the Indemnification Claim. Without proper notice or consent, there was no viable claim for the Special Committee to pursue or preserve. Because the Indemnification Claim was not viable, it had no economic value. In other words, had the Special Committee successfully placed the claim in trust for Straight Path's stockholders, that asset would have had no value. Based on the post-trial record, the $10 million Defendants paid was therefore not unfair.

### c. Contribution under Section 6.03

Plaintiff contends that Section 6.03 of the S&DA provides an equitable means of bypassing the notice and consent defects discussed above.[390] Section 6.03 provides:

> In circumstances in which the indemnity agreements provided for in Sections 6.01 and 6.02 are unavailable or insufficient, for any reason, to hold harmless an Indemnified Party in respect of any Indemnifiable Losses arising thereunder, each Indemnifying Party, in order to provide for just and equitable contribution, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Indemnifiable

---

[390] PL PTOB 117–19; PL PTAB 94–95.

Losses, in proportion to the relative fault of the Indemnifying Party or Parties on the one hand and the Indemnified Party or Parties on the other in connection with the statements or omissions or alleged statements or omissions that resulted in such Indemnifiable Losses, as well as any other relevant equitable considerations. The relative fault of the parties shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the alleged omission to state a material fact relates to information supplied by SPCI or IDT, the Parties' relative intents, knowledge, access to information and opportunity to correct or prevent such statement or omission, and any other equitable considerations appropriate in the circumstances.[391]

Even assuming Plaintiff is correct in reading this provision as an equitable backstop, I find that equity does not support Plaintiff's claims.

Plaintiff seeks to force contribution from IDT for the penalties Straight Path paid under the Consent Decree based on the parties' relative fault. However, even assuming the FCC investigation of Straight Path was attributable to pre-spin-off violations by IDT, it would be inequitable to pin the liability on IDT stockholders. Straight Path rushed into the Consent Decree out of self-interest.[392] It did so without providing IDT with the contractually mandated notice that it would be seeking indemnity for the penalties under that settlement.[393] This interfered with IDT's exercise of its contractual right to protect its interests by withholding its consent for a settlement from which Straight Path enjoyed the benefits, while foisting the

---

[391] JX107.0019.

[392] *See* JX243; JX249.0002 (pressing the FCC toward an early resolution); TT (Davidi) 131:22–132:13; TT (Todd) 1367:7–15; TT (Zeidman) 1462:19–1463:18.

[393] Again, excluding Davidi's February 2016 email, which predated the FCC investigation. *Compare* JX161.0001, *with* JX199.0002 (FCC letter of inquiry dated September 20, 2016).

liabilities onto IDT. That is, it would be inequitable to allow Straight Path, through Plaintiff, to breach its contractual obligations in bypassing the S&DA's notice and consent requirements, to put in place a contingent settlement amount, so that the indemnification asset grew in concert with increasing value of the company sale. This would saddle IDT with liabilities that Straight Path willingly incurred, that grew as the windfall of the sale grew. This was all upside to Straight Path, and all downside to IDT.

The underlying equities do not support a transfer payment from IDT to Straight Path's former stockholders. Straight Path was a vessel intended to allow monetization of the IP Assets. The Spectrum Licenses were included in the spin-off for tax reasons. They were not considered to be particularly valuable. That changed—to Straight Path's great benefit—with a change in law and technology. Straight Path's settlement with the FCC allowed the sale of these assets for an eye-popping price, and as the auction value grew, so did the value of an indemnification claim, if viable. Accordingly, Plaintiff seeks damages that far exceed IDT's ability to pay or its liquidation value. These are not considerations if the question is one of contract. But to the extent that the question is one of equity, bankrupting IDT in light of the windfall to Plaintiff is not supported. Plaintiff's contribution arguments fail.

71

### 3. Unified Analysis and Damages

I have found that, based on the record at trial, the Indemnification Claim was not viable, and the price paid to release the claim was not unfair, because if the asset had been held in trust for the minority, it would be valueless. That does not end my analysis. The question is one of entire fairness, and what the stockholders could have achieved, absent the iniquities. Below, I examine what a reasonable sale process for a release of the Indemnification Claim would have achieved, absent the controller imposing an unfair process. That value is greater than zero, because it involves the value of the claim, given its uncertainty, in a negotiation over its release at the time of the transaction. "[T]his court has held that a fair price 'does not ameliorate a process that was beyond unfair.'"[394] "Both aspects of the entire fairness test — fair dealing and fair price — must be satisfied."[395] In order to determine whether the settlement of the Indemnification Claim was entirely fair, I analyze whether Howard's flagrant process violations caused IDT to pay less than "the value that the stockholders would have received if the defendants had followed a reasonable process to obtain the best transaction reasonably available[.]"[396] This assessment provides an opportunity to evaluate the transaction holistically and

---

[394] *In re Tesla Motors, Inc. S'holder Litig.*, 2022 WL 1237185, at *32 (Del. Ch. Apr. 27, 2022), *aff'd*, 298 A.3d 667 (Del. 2023) (quoting *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014)).
[395] *In re Tesla Motors, Inc. S'holder Litig.*, 298 A.3d at 715.
[396] *Goldstein v. Denner*, 2022 WL 1797224, at *3 (Del. Ch. June 2, 2022).

"eliminate the ability of the defendants to profit from their breaches of the duty of loyalty."[397]

The facts of record demonstrate that Straight Path had a genuine interest in settling the Indemnification Claim in order to provide the Spectrum Licenses with clear title ahead of a sale.[398] Similarly, even in an alternate reality in which Howard had adhered to a reasonable process, IDT's interest in settling the Indemnification Claim would have remained. The Special Committee, recognizing the frictions that the Indemnification Claim brought to the sale process,[399] was open to the possibility of settling the Indemnification Claim for a fair price.[400] Accordingly, I assess the reasonable value of an arms-length settlement, negotiated on March 29, 2017.[401]

---

[397] *See In re Dole Food Co., Inc. S'holder Litig.,* 2015 WL 5052214, at *2.

[398] TT (Todd) 1224:10–14.

[399] TT (Todd) 1380:19–1381:16; TT (Weld) 1835:16–1836:2, 1836:12–21, 1994:17–21, 2004:7–15.

[400] TT (Fortinsky) 2244:6–17.

[401] Plaintiff invites me to evaluate the fair value of the Indemnification Claim as of the date the Verizon merger was announced. PL PTAB 106. As support, she cites only to *Bomarko*. *Id.* (citing *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1189 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000)). But *Bomarko* does not advocate for such adjustments. Indeed, then-Vice Chancellor Lamb warns against such "rank speculation" in precisely the passage Plaintiff cites. *Id.* at 1189 n.14. Accordingly, I find the best solution available is to evaluate the fair value as of the date of the original settlement. This is consistent with Delaware courts' approach to evaluating fair price in the merger context. *See Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186–87 (Del. 1988) (discussing how the evaluation of fair price is appropriately conducted as of the day of the transaction in question, including all relevant information then available). Importantly, in this counterfactual, I need to evaluate how arms-length parties would have valued the claim. I find that the highest, but as yet unconsummated and unsecured, offer at the time of the negotiation would have informed a willing arms-length buyer and seller as to the value of the Indemnification Claim.

### a. The Framework[402]

I begin my analysis by calculating the facial value of the Indemnification Claim, assuming its viability, based on the highest bid as of the date of the settlement. I then adjust that figure downward to account for the expense Straight Path would incur litigating the claim against IDT, yielding a baseline value. Taking this baseline, I apply further discounts to account for the claim-dispositive risks associated with the parties' contentions around whether: (i) the claim is a SPCI Liability, (ii) the liability is attributable to pre- or post-spin-off actions, (iii) notice and consent was fulfilled, and (iv) the proposed trust structure was viable. This yields a risk-adjusted value that would have been apparent to reasonable parties as of March 29, 2017, that I then compare with the lowest estimate of the amount paid, $10 million.

### b. The Unadjusted Value of the Indemnification Claim

A viable Indemnification Claim against IDT for the penalties paid under the Consent Decree has three components: the $15 million upfront cash penalty, the 196 forfeited licenses, and the 20% of sale proceeds payable to the FCC.[403] It is

---

[402] While in some respects the methodology I use to assess the reasonable settlement value of the Indemnification Claim mirrors that used by Professor Hamermesh in his expert report, I do not rely on that report, its analysis, or its conclusions. This approach is broadly similar to that used to value a litigation asset in *Bomarko*, in which then Vice Chancellor Lamb discounted the claim based on his assessment of the probability of success before subtracting the reasonable costs of prosecuting the claim. *Bomarko*, 794 A.2d at 1189–90.

[403] JX316.

undisputed that the highest bid as of March 29, 2017, was $800 million.[404]   To

determine the value of the forfeited licenses, I draw on the expert report, largely

unrebutted, of Plaintiff's valuation expert, J. Armand Musey.[405]   After making

adjustments for license geography and overlap,[406] Mr. Musey determined that that

the forfeited licenses accounted for 14.8% of the value of the total portfolio.[407]

Applying this to the highest prevailing bid of March 29, 2017, yields an unadjusted

forfeited license value of $118.4 million.  The same manipulation using the 20%

payable to the FCC results in $160 million.

Adding up the three components, I find that a viable Indemnification Claim

had an unadjusted value of $293.4 million as of March 29, 2017.

### c. Cost of Litigation

The first adjustment I make to this number is for the projected expense that

Straight Path would incur by prosecuting the Indemnification Claim through to

recovery.  Defendants suggest an adjustment of $30 million,[408] based on the amount

the Special Committee projected it would need to fund the litigation trust.[409]  Plaintiff

---

[404] PTO ¶ 151.
[405] JX732.
[406] *Id.*; TT (Musey) 2983:6–7.
[407] *See* PL PTOB 95 (converting Mr. Musey's dollar figure conclusion into a percentage of the portfolio value).
[408] DF PTOB 165.
[409] *See, e.g.,* JX433 (outlining the litigation trust structure for bidders, including its proposed funding amounts and sources).

suggests a flat 15% adjustment consistent with this Court's decision in *Bomarko*.[410] Because the Special Committee did not discuss hiring a plaintiff's firm to pursue the Indemnification Claim on contingency[411]—the main scenario in which a flat percentage adjustment makes sense—I find that Defendants' suggested adjustment of $30 million is consistent with what the Special Committee reasonably would have assumed at the time of the settlement.

Thus, the baseline value of a viable Indemnification Claim was $263.4 million after incorporating the estimated cost of litigation but before adjusting for litigation risk.

### d. Necessary Adjustments

As discussed in Section II.B.2, Straight Path's prosecution of the Indemnification Claim faced numerous claim-dispositive hurdles to collection. As Plaintiff notes, *Bomarko* "is the most analogous authority" when it comes to valuing a litigation asset.[412] There, the Court applied a 20% discount to the value of the claim based on its "assessment of the probability of success on the merits[,]" which were "unusually strong[.]"[413] While I adopt *Bomarko*'s intuitive approach, I cannot

---

[410] PL PTAB 106; *Bomarko*, 794 A.2d at 1189–90. It appears that the *Bomarko* Court estimated that 15% yielded a figure that was appropriate to the facts and circumstances of the claim in that case, rather than assuming contingent representation. *Id.*

[411] TT (Fortinksy) 2112:24–2113:12.

[412] PL PTAB 106.

[413] *Bomarko*, 794 A.2d at 1189.

do as the Plaintiff asks and import that decision's adjustments wholesale.[414] Instead, in order to assess the Indemnification Claim's probability of success on the merits, I calculate an overall discount based on the aggregate probability that the claim could survive all four of the dispositive hurdles it faced. Although I have determined, on a trial record, that the Indemnification Claim—if preserved—would not have value, here I base the assessment of value in light of the risk of non-viability, as it would have appeared based on the information available to the Special Committee and its counsel—and its IDT counterparties—as of March 29, 2017.

### i. SPCI Liability under Subpart (ii) – 50%

The first hurdle to prosecution of the Indemnification Claim is whether the penalties under the Consent Decree are carved out from indemnification as SPCI Liabilities. Specifically, the language of subpart (ii) of the SPCI Liabilities definition creates ambiguity as to whether liabilities traceable to pre-spin-off activity are allocated to Straight Path or IDT.[415] The Special Committee was aware of this ambiguity prior to settlement and understood that it was detrimental to the Indemnification Claim.[416] Resolving this ambiguity, the Special Committee could

---

[414] *See* PL PTAB 106 (seeking to apply *Bomarko*'s methodology to utilize litigation discounts in valuing the Indemnification Claim).

[415] JX107.0009. I decline to address the impact of subpart (iv), given my finding that the language is unambiguous. *Straight Path II*, 2022 WL 484420, at *11. In any event, its exclusion does not change the result of this analysis.

[416] *See, e.g.,* TT (Todd) 1230:6–9 (acknowledging that he thought the language was ambiguous from the first read), 1231:8–1232:2 (describing Weld's concern about the language); TT (Weld)

77

anticipate, with the necessity of developing a trial record of the drafters' intent,[417] creating real uncertainty as to which interpretation would prevail. Accordingly, I find that the Special Committee could have reasonably assigned Plaintiff's interpretation of subpart (ii) a 50% probability of success on the merits.

### ii. Attributable to Post-Spin-Off Actions – 80%

Assuming a favorable ruling on subpart (ii), Straight Path would have next needed to show that the penalties under the Consent Decree were attributable to pre-spin-off violations. The Special Committee believed that the penalties related to pre-spin-off conduct.[418] Documentation around the Consent Decree supports this belief, making mention of buildout issues associated with substantial service demonstrations,[419] which occurred pre-spin-off. However, the Special Committee would also need to balance this belief against the possibility that Straight Path's conduct, including both its response to the FiberTower allegations and lack of post-spin-off remediation,[420] played a role in the FCC's investigation. Accordingly, I find

---

1729:10–1731:23 (describing how the language of subpart (ii) "undercuts" the Indemnification Claim, leading Weld to believe the language had potentially been altered). Given that the language of subpart (ii) dates back to the first draft of the S&DA, I need not address the alteration theory further. *See* JX92.0010 (using the same language, including the drafting errors).

[417] Indeed, I denied summary judgment as to subpart (ii) for this very reason. *Straight Path II,* 2022 WL 484420, at *11.

[418] *See* TT (Todd) 1278:20–1280:3, 1360:1–10; TT (Weld) 1929:8–17.

[419] JX316.0002.

[420] *See, e.g.,* TT (Weld) 1871:10–18 (describing Straight Path's response as "a bit fast"); TT (Zeidman) 1505:21–1506:13 (admitting that Straight Path was not necessarily in full compliance with FCC requirements).

that, as of March 29, 2017, the Special Committee could have reasonably assigned an 80% probability to vindication of its belief that the FCC investigation related to IDT's pre-spin-off conduct.

### iii. Notice & Consent Fulfilled – 20%

Though it was aware of the notice and consent requirements under Section 6.07 of the S&DA,[421] the Special Committee operated under the assumption that it did not need to provide written notice to or obtain explicit consent from IDT prior to settling with the FCC.[422] Instead, the independent directors believed that IDT's actual notice of the settlement was sufficient.[423] Given the plain text of Section 6.07, I find that this belief was unreasonable. Thus, given the lack of written notice and explicit consent, Plaintiff could only advance a theory that an indemnification claim could be brought against IDT post-settlement without material prejudice, based only on implied consent.[424] The flaws in this theory were clear at the summary judgment stage, when it only narrowly avoided dismissal.[425] I therefore find, upon review of Section 6.07, that a reasonable Special Committee could only assume a 20% probability that the notice and consent requirements had been met.

---

[421] TT (Zeidman) 1525:24–1527:6.

[422] TT (Todd) 1220:13–1221:16, 1223:12–24; TT (Zeidman) 1526:17–1527:6, 1529:24–1530:13 (testifying that the Special Committee did not believe it needed IDT's consent to settle with the FCC or to pursue an indemnification claim).

[423] TT (Todd) 1220:13–1221:16.

[424] PL PTOB 112–17.

[425] *Straight Path II*, 2022 WL 484420, at *11.

79

### iv. Trust Viable – 40%

Finally, I turn to the viability of the trust that would preserve the Indemnification Claim. As a threshold matter, the Special Committee believed, on the advice of counsel, that the structure of the trust was feasible.[426] I therefore apply only a minimal 10% discount representing the uncertainty of litigation around contractual permissibility and the possibility that Defendants' anti-assignment arguments might succeed.[427]

The proposed structure involved Straight Path—which would be owned by the acquiror, not the former stockholders—nominally retaining the Indemnification Claim in a trust post-merger.[428] The buyer would fund the trust from the merger proceeds,[429] but would otherwise be walled off from all decision-making around the Indemnification Claim.[430] Any proceeds from the litigation would flow to the former Straight Path stockholders as beneficiaries.[431]

The problem with this proposed structure is that it would likely require the acquirer to be involved in litigation around the Indemnification Claim, with little or no upside. Straight Path's new owner would not have control over the litigation or

---

[426] TT (Fortinsky) 2286:15–2287:6, 2293:15–18.
[427] *Accord Bomarko*, 794 A.2d at 1189 (applying a 20% discount to an "unusually strong" claim, based on the same factors).
[428] JX394.0001.
[429] *Id.*
[430] TT (Todd) 1380:19–1381:16; TT (Zeidman) 1539:8–17.
[431] JX432.0016–23; TT (Fortinsky) 2105:10–2106:6.

partake in any recovery but would nonetheless be on the hook for any counterclaims brought by IDT.[432] Though these risks could perhaps be mitigated through further contractual allocations,[433] I find that the Special Committee should reasonably have assumed probability of *at least* 50% that the acquirer would not be interested in preserving the Indemnification Claim. Reducing this 50% by the earlier 10% discount results in a total combined risk adjustment of 40% for trust viability.[434]

### e. Comparison with Price Paid

Combining these various adjustments for claim-dispositive risks yields an overall risk adjustment to 3.2% of the potential value of the claim.[435] Multiplying this by the baseline of $263.4 million results in a risk-adjusted value for a viable Indemnification Claim of $8.4288 million as of March 29, 2017.[436] A settlement in that vicinity would have been a reasonable result of a fair, uncontrolled negotiation of a release of the Indemnification Claim. Plaintiff and the class therefore suffered no damages as a result of the coerced settlement at $10 million.

---

[432] TT (Fortinsky) 2119:19–2121:12.

[433] *Id.* at 2119:8–22.

[434] Again, this analysis attempts to look at the hypothetical negotiating position of an Independent Committee unconstrained by an unfair process. Because I found, supra, that the Indemnification Claim would not have had value had it been preserved, due to failure of Straight Path to comply with its duties of notice and consent, I did not reach the question of actual viability in light of assignability and the infelicities of any attempt to have a buyer act as a trustee for the stockholders regarding the claim. It is worth noting the I find the latter a formidable barrier to viability, however.

[435] $(0.5 * 0.8 * 0.2 * 0.4 = 0.032)$.

[436] Because this figure falls below the $10 million paid, I decline to address the issue of IDT's ability to pay.

### f. Unified Fairness Conclusion

Howard used his controller position to bully the Special Committee into release of the Indemnification Claim at a price he unilaterally determined to be proper. Absent that bullying, the Committee would have retained the Claim as a stockholder asset or engaged in a fair negotiation for a release. Instead, it was forced to capitulate to Howard's demands. While the price was fair, the transaction was tainted by Howard's flagrant breach of duty, and was not entirely fair.

*C. Plaintiff's Claims*

Despite the lack of damages, I find that Howard breached his duty of loyalty to the minority stockholders through his coercion of the Special Committee.[437] However, the aiding and abetting claim against IDT requires a showing of damages.[438] Accordingly, this secondary claim fails.

## III. CONCLUSION

Consistent with the above, I find Howard Jonas liable to pay the class nominal damages. Plaintiff's remaining claims are dismissed. The parties should inform me as to the form of nominal damages should take and submit a suitable form of order.

---

[437] *See Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd sub nom. Asdi, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) ("A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty").
[438] *See RBC Cap. Markets, LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (reciting the elements of aiding and abetting breach of fiduciary duty, including damages).